Terry **BRANDT, M.D., Randall S. Zane, M.D., and Michael J. Burke, M.D.,** Appellants,

v.

Kelley Brooke **SURBER, Individually and on Behalf of the Estate of William Tate Surber, Deceased, and as Next Friend of Loren Bailey Surber and Nicholas Tate Surber, Minor Children, Walter Sidney Surber, and Margie Surber,** Appellees.

No. 13-02-00360-CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

June 8, 2006.

Carlos Villarreal, Hermansen, McKibben, Woolsey, Thomas F. Nye, Brin & Brin, Corpus Christi, for appellants.

Darrin Walker, Law Office of Darrin Walker, Kingwood, Mary Wilson, Clem V. Lyons, Laura R. Pazin, Lyons & Rhodes, San Antonio, Sam H. Burris, Alice, for appellees.

Before Justices HINOJOSA, YAÑEZ, and CASTILLO.

## OPINION

Opinion by Justice HINOJOSA.

This is an appeal from the trial court's judgment in a medical malpractice case that arose from the death of William Tate Surber ("Tate"). Appellees, Kelley Brooke Surber ("Brooke"), individually and on behalf of the Estate of William Tate Surber, Deceased, and as next friend of Loren Bailey Surber and Nicholas Tate

Surber, minor children, Walter Sidney Surber, and Margie Surber, sued appellants, Terry Brandt, M.D., Randall S. Zane M.D., and Michael J. Burke, M.D., alleging that appellants' failure to order an angiogram following two episodes of severe bleeding was the cause of Tate's death and amounted to medical malpractice. After nine days of testimony, a jury found in favor of appellees, and the trial court rendered judgment in accordance with the jury's findings. Drs. Brandt and Zane challenge the judgment in seven issues; Dr. Burke challenges the judgment in three issues. We affirm.

## I. Background

Tate suffered from advanced allergic fungal sinusitis. On September 25, 1998, he underwent surgery at Spohn Hospital in Corpus Christi, Texas, to remove polyps and other fungal tissue from his sinus cavities. Surgery was performed by Dr. Brandt, an otolaryngologist, and Dr. Burke, a neurosurgeon. Near the end of surgery, Tate began bleeding briskly from inside his sinus cavity. In his operative report, Dr. Brandt dictated that during the surgery,

> both sphenoid sinuses were opened and then the intra sinus septum was also removed. The sphenoid sinus on the right side was found to be extensive in its depth and in lateral extension. The left sphenoid sinus was extensive in its vertical direction.

He described that

> [w]hen the nose was being suction[ed], spontaneous bleeding started on the right side posteriorly. This was way back in the nose in the general area of the sphenoid sinus or posterior ethmoid area. Fairly extensive brisk bleeding occurred in this location from the lateral wall surface. Monopolar cauterization was attempted [by Dr. Brandt] without

success, and then the microscope was brought in and bipolar cauterization was done [by Dr. Burke] with pituitary micro surgical instruments with satisfactory control of bleeding. Approximately 200 to 250 cc. of blood was lost during this episode.

The postoperative report described the operative complications as "increased bleeding due to extensive polyploid disease and bleeding close to the termination of the case from the right posterior nose, nasopharynx and sphenoid sinus area requiring control with electrocautery." Tate was discharged from the hospital on September 29, 1998, and attended a follow-up office visit with Dr. Brandt on October 1.

On October 3, 1998, Tate returned to the emergency room at Spohn Hospital due to heavy bleeding from the right side of his nose and was admitted for "severe epistaxis/post-operative hemorrhage." Dr. Zane, an otolaryngologist who was on call for Dr. Brandt, performed a second surgery to stop the bleeding. The medical records describe that Tate began to have

> brisk bleeding from the right side of the nose initially and then from both sides of the nose. He went through 2 rolls of toilet paper trying to control the bleeding, and this did not take care of it. It began to slow with some ice and he was driven to the emergency room by his wife from Orange Grove. On arrival he was hemodynamically stable with some steady oozing from both sides of his nose.

Tate was taken immediately to the emergency room for examination under anesthesia. Dr. Zane's post-operative notes described that

> the sphenoid sinus was identified and it was widely open with the posterior most aspect of the septum having been removed. An obvious bleeding vessel was squirting from inside the sphenoid sinus

on the right lateral wall, a constant flow. This area was further cleaned with suction and it appeared to be close to the region of the carotid canal. Landmarks were poor inside the sinus because of the amount of clot and because of the swollen remaining mucosa. The sphenoid sinus was irrigated copiously with saline giving a little bit better view. Then, under direct vision, the bleeding vessel was cauterized using the bipolar cautery and around this lightly with the monopolar cautery. This controlled the bleeding.

Dr. Zane characterized the procedure as "endoscopic control of sphenoid sinus hemorrhage." Dr. Zane's deposition testimony described the bleeding vessel as being one to two millimeters and "standing up like a garden hose" and "squirting across the sphenoid wall." Tate was released from Spohn Hospital on October 6th. He saw Drs. Brandt and Burke, individually, for follow-up visits on October 15th, and was released on that day to go back to work on light-duty.

On October 21, 1998, sometime after 11:00 p.m., Tate again began to bleed profusely from his nose. Tate's wife, Brooke, called Tate's brother, Walter Sidney Surber, Jr. ("Buddy"), who lived nearby and asked him to drive Tate back to Spohn Hospital from their home in Orange Grove, approximately 45 minutes away. En route, Tate continued bleeding heavily and lost consciousness. In Orange Grove, Texas, Buddy passed an off-duty sheriff's deputy and pulled over to request help. At 12:15 a.m., the officers called for an ambulance, while Buddy and Brooke attempted to perform CPR. An ambulance and paramedics arrived on the scene at 12:35 a.m. At the time the ambulance arrived, Tate had no pulse and no blood pressure. EMS records reflect that Tate was in full cardiac arrest and was hemorrhaging from his mouth and nasal cavity. Tate was trans-ported to Columbia Alice Physician's & Surgeon's Hospital in Alice, Texas, where he was pronounced dead.

## II. Sufficiency of the Evidence

In the first five issues of Drs. Brandt and Zane, and in Dr. Burke's first and second issues, appellants contend the evidence is legally and factually insufficient to support the jury's findings.

### A. STANDARD OF REVIEW

When we review a "no evidence" or legal sufficiency of the evidence issue, we view the evidence in the light most favorable to the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001). We sustain a no-evidence challenge only when the record discloses that (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Havner,* 953 S.W.2d at 711.

When we review an "insufficient evidence" or factual sufficiency of the evidence issue, we consider, weigh and examine all of the evidence which supports or undermines the jury's finding. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442,

445 (Tex.1989). We review the evidence keeping in mind that it is the jury's role, not ours, to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Pickett v. Keene,* 47 S.W.3d 67, 74 (Tex.App.-Corpus Christi 2001, pet. dism'd). We set aside the jury's finding only when we find that the evidence standing alone is too weak to support the finding, or that the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996).

■ To prevail on a medical malpractice claim, a party is required to establish four elements: (1) a duty by the physician to act according to a certain standard of care, (2) a breach of the applicable standard of care, (3) injury or harm to the plaintiff, and (4) a causal connection between the breach of the applicable standard of care and the injury or harm. *Krishnan v. Ramirez,* 42 S.W.3d 205, 212 (Tex.App.-Corpus Christi 2001, pet. denied).

### B. PROXIMATE CAUSE

■ We first address appellants' contention that the evidence establishing proximate cause is legally and factually insufficient. To establish proximate cause, a plaintiff must prove both (1) cause-in-fact, and (2) foreseeability. *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988).

#### 1. *Cause-in-Fact*

■ To show cause-in-fact, appellees were required to establish a causal connection between the injuries suffered and the negligence of appellants based upon "reasonable medical probability," not mere conjecture, speculation, or possibility. *See Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex.1995); *Kramer v.*

*Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 400 (Tex.1993); *Duff,* 751 S.W.2d at 176. The ultimate standard of proof on causation is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred. *Park Place Hosp.,* 909 S.W.2d at 511; *Kramer,* 858 S.W.2d at 400; *Brownsville Pediatric Ass'n v. Reyes,* 68 S.W.3d 184, 188–89 (Tex.App.-Corpus Christi 2002, no pet.). Reasonable probability is determined by the substance and context of the opinion, and does not turn on semantics or on the use of a particular term or phrase. *Arlington Mem'l Hosp. Found., Inc. v. Baird,* 991 S.W.2d 918, 922 (Tex.App.-Fort Worth 1999, pet. denied) (citing *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 500 (Tex.1995)). Unless the medical treatment at issue is a matter of common knowledge or is within the experience of the layman, expert testimony is required to establish negligence. *Hood v. Phillips,* 554 S.W.2d 160, 165–66 (Tex.1977); *see also Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 876 (Tex.2001) (recognizing necessity of expert testimony in medical malpractice cases).

The trial was marked by numerous factual disputes. The parties primarily contested (1) whether the artery that bled during any or all of Tate's bleeding episodes was the internal carotid artery ("ICA"), (2) whether there was a layer of bone between Tate's ICA and his sphenoid sinus, (3) whether an angiogram would have shown any treatable abnormality, and (4) whether Tate died of exsanguination due to hemorrhage or some other cause. In their first four issues, Drs. Brandt and Zane complain that the evidence resolving these disputes is legally and factually insufficient. In their fifth issue, Drs. Brandt and Zane contend the evidence is legally

and factually insufficient to establish that the harm was foreseeable. Drs. Brandt and Zane generally assert that by failing to sufficiently establish these issues, appellees failed to establish proximate cause. In his second issue, Dr. Burke contends the evidence is legally and factually insufficient to establish proximate cause as a whole.

In support of their allegations, both sides relied on the surgical records from Spohn Hospital, EMS records, emergency room records from Alice Physicians & Surgeons Hospital, CT and MRI films completed on September 6, 1998, the autopsy report, surgical notes and reports completed by appellants, and the deposition testimony of appellants. In addition, both sides used expert testimony to explain the relevant anatomy, interpret the information contained in the medical records, and draw conclusions therefrom.

Appellees offered the testimony of the following expert witnesses: (1) neurosurgeon Arnulfo R. Garza–Vale, M.D.; (2) otolaryngologist Douglas E. Mattox, M.D.; (3) otolaryngologist George Gates, M.D.; (4) emergency room physician Allen Hackley, M.D.; and (5) forensic pathologist Robert Bux, M.D. In addition to their own testimony, appellants also offered the testimony of the following expert witnesses: (1) neurosurgeon Lee Vanderpool Ansell, M.D.; (2) neuroradiologist Carlos Bazan, M.D.; (3) otolaryngologist Mike Bertino, M.D.; and (4) forensic pathologist Lloyd White, M.D., M.E., the medical examiner who conducted the autopsy on Tate.

### a. Was the Bleeding Vessel the Internal Carotid Artery?

In their first issue, Drs. Brandt and Zane contend the evidence is legally and factually insufficient to show that the bleeding vessel was the ICA or a branch thereof. The ICA is one of the main arteries that supplies blood to the brain. It travels through the base of the skull and passes directly behind the right lateral wall of the sphenoid sinus, the sinus furthest back. In support of their claim that Tate died from a hemorrhage of his ICA, appellees presented evidence that (1) the type of bleeding, (2) the location of the bleeding, and (3) the speed at which Tate lost consciousness and died, all indicate that the compromised vessel was the ICA or a branch thereof.

### (1) Type of Bleeding

Appellees claimed that the type of bleeding Tate experienced during the first two surgeries was arterial bleeding. The medical records show that Tate lost approximately 200–250 cc. of blood during the first surgery and approximately 200–400 cc. of blood during the second surgery. Drs. Garza–Vale, Mattox, and Gates all testified that the brisk bleeding described by appellants and the rapidity at which Tate lost such a significant amount of blood indicate that the bleeding vessel was an artery and not a vein; an artery pumps and squirts blood because it is under greater pressure, while a vein will ooze. Dr. Garza–Vale opined that all three bleeds experienced by Tate meet the description of arterial bleeds. He further opined that the descriptions given by the defendants indicate that the same vessel bled all three times. Dr. Mattox explained that it is very unusual to encounter arterial bleeding in the sphenoid sinus, and that there is no named vessel normally in the sphenoid sinus that fits the description contained in Dr. Zane's surgical report.

Dr. Gates opined that the bleeding vessel was most likely the ICA because of the amount of bleeding described in the surgical reports. Dr. Gates further testified that although he would not normally ex-

pect to find a named artery in the sphenoid, and that no branches of the ICA are normally found in the sphenoid, the ICA is the only possible source of the bleeding and of the one to two millimeter vessel described by Dr. Zane in his surgical notes.

### (2) Location of Bleeding

Next, appellees claimed that the bleeding originated from the right lateral wall of the sphenoid sinus, thus indicating that the breached vessel was the ICA. Experts for both sides generally agreed that the ICA is located behind the right lateral wall of the sphenoid; however, appellants disagree that this is the location from where the bleeding originated. Experts for appellees testified that they took the postoperative reports and deposition testimony of appellants at "face value" in determining that location of the bleeding.

After the first bleed, Dr. Brandt described the location of the bleeding as "way back in the nose in the general area of the sphenoid sinus or posterior ethmoid area. Fairly extensive brisk bleeding occurred in this location from the lateral wall surface." Appellees also relied on Dr. Burke's deposition testimony that as the spontaneous bleeding began, Dr. Brandt told him the bleeding was coming from the area of the carotid canal. Dr. Zane described the bleeding as "squirting from inside the sphenoid sinus on the right lateral wall."

Dr. Gates testified that, in addition to the specific descriptions given by appellants, he used the entire context of both surgeries to aid in his interpretation of the postoperative reports, and in his opinion, Dr. Zane's postoperative report clearly describes the bleed as being located in the lateral wall of the sphenoid sinus, the area of the ICA. Dr. Mattox opined that, according to his interpretation of the medical records, the defendants knew they had a bleeding vessel in the area of the ICA, but they did not think it was the ICA itself.

Appellants strongly contested appellees' assessment of the location of the bleeding, arguing that the location of the bleeding was not near where the ICA would have been located. Dr. Brandt testified that the appellees' experts misconstrued his description of the location of the bleeding during the first surgery. He explained that because so many anatomical landmarks were removed during Tate's initial surgery, it was hard to accurately describe exactly where the bleeding was; sinus cavities that were usually separated were now one big open space. The area he was trying to describe was the location of one of the separating structures that had been removed. He testified that the bleeding was not in any of the sinuses clearly, but in this middle ground that was hard to describe. He explained that he made three attempts to describe where the bleeding was coming from: the nasopharynx sphenoid area, sphenoid sinus posterior ethmoid area, and nasopharynx lateral sphenoid wall.

Dr. Burke testified that he agreed with Dr. Brandt's description of the location of the bleed as being in the junction of the sphenoid and ethmoid sinuses. However, he explained that due to the removal of important landmarks, it was difficult to determine location and, in his opinion, depending on the angle, the bleeder could appear to be both inside the sphenoid and outside the sphenoid. However, he testified that he was sure it was nowhere near the location of the ICA, and he was also sure that no branches of the ICA go into the sphenoid.

Dr. Zane testified that the landmarks in Tate's nose were poor and it was difficult to tell exactly where the sphenoid sinus started because the front wall had been

removed. However, he said that knew he was near the area where the anterior sphenoid wall should have been and, in his opinion, he was working just inside the sphenoid sinus; the structures he needed to avoid, such as the optic nerve and the ICA, were further back. He testified that he could see the area of the carotid canal, but he was not in it.

Drs. Brandt and Zane presented conflicting opinions on the location of the bleeding vessel. Dr. Brandt opined that neither the first nor the second bleeding episodes were in the sphenoid sinus, but were located in the lateral wall of the nose. Dr. Brandt further opined that Dr. Zane was wrong when he said the bleed was in the sphenoid. Dr. Brandt asserted he was in a better position to determine the location of the bleeding because he was the one who removed the anatomical landmarks during the initial surgery.

Dr. Zane maintained his original description of this as a sphenoid sinus hemorrhage. The vessel was coming out right where the sphenoid sinus starts and it was squirting into the sphenoid sinus.

Dr. Brandt explained that in earlier deposition testimony relied upon by appellees' experts, in which he stated that he had told Dr. Burke he was working in the area of the ICA, he was using the location of the ICA to orient Dr. Burke to the general area of the nose he was in, and "close" is a relative term. However, he was not actually close to the ICA at the time, and the ICA was not a concern at the time.

Dr. Burke acknowledged that he and Dr. Brandt have different recollections of what was said at Tate's first surgery. Dr. Burke acknowledged that at his first deposition, taken eleven months after Tate's death, he had testified that Dr. Brandt had mentioned to him that he was working in the area of the carotid canal. However, he did not have any concerns that the ICA was involved; had it been, there would have been "an explosion" of blood. When he looked into Tate's nose, he saw a small pumping artery that in his opinion was neither the ICA nor a branch of the ICA.

Dr. Ansell testified that due to the common sinus cavity created by the first surgery, he did not think anyone could precisely pinpoint the location of the bleeds or say whether they were working in any particular sinus; nor could they pinpoint exactly which vessel had bled. He acknowledged that Drs. Zane and Brandt had both described specific locations, but in his opinion, the removal of landmarks in the sinuses made it impossible for them to know exactly where the bleeding occurred.

Dr. Bertino testified that from his reading of the medical records, he understood the location of the bleeding vessel repaired by Dr. Zane to be in the "anterior lateral aspect of the sphenoid sinus" (side and to the front), not the back half of the sphenoid where the ICA would be.

### (3) Speed at which Tate Lost Consciousness and Died

Finally, appellees claimed that the speed at which Tate lost consciousness and died make the ICA the only possible source of the hemorrhage. There were varying time estimates as to how much time passed between when Tate began bleeding and when he lost consciousness. Tate's wife, Brooke, and Buddy both recalled that Tate began bleeding sometime after 11:00 p.m., though neither could specify an exact time. In addition, both testified that under the circumstances, they were not keeping track of the amount of time that was passing. Appellees assert that, given that Buddy lived only one-half mile away from Tate and Brooke, and the speed at which he was driving (approximately 100 miles

per hour), not much time passed between when Tate began bleeding and when he lost consciousness in the truck approximately thirteen miles away. Appellees assert that only a breach of the ICA could cause someone to exsanguinate so quickly.

Appellants argue that if the final hemorrhage had been from the ICA, Tate would have lost consciousness and died much faster than described. In Dr. Ansell's expert opinion, if there was a hole in the ICA large enough for any blood to flow through, the wall of the ICA would likely disintegrate quickly, leading to massive bleeding. Generally a ruptured ICA would cause a person to lose consciousness within seconds and exsanguinate within two to three minutes, if the full size of the vessel is bleeding. Dr. Ansell acknowledged that if the hole is smaller, the bleed would take longer. However, he opined that with Tate's sphenoid sinus opened as it was, there was nothing to impede the flow from the ICA and Tate would have died within minutes. Dr. Burke agreed that if the final bleeding episode had been from the ICA, there was nothing to obstruct the flow of blood and, in his opinion, Tate would have bled to death within minutes. Dr. Bertino opined that if the ICA had blown out, Tate would not have been conscious when they reached the city limits of Orange Grove, approximately thirteen miles away. In his opinion, if the ICA ruptures, the person is going to be dead within 10–15 minutes.

However, Dr. Gates countered that the speed of exsanguination described by appellants' experts of mere minutes was correct only when dealing with a rupture of the ICA in the head or neck; a bleed from the ICA in the sphenoid sinus would not cause death as quickly because of the size of the location. A rupture of the ICA in the sphenoid is limited by the size of the sinus, and it would therefore take longer for a person to exsanguinate.

In opposition to appellees' theory, appellants argue that the size of the vessel observed by appellants eliminated the ICA as the possible source of the bleeding and made it more likely that it was the sphenopalatine artery ("SPA"). Dr. Zane testified that he could not only see the blood, but he could see the vessel that it was coming from; it was an entire vessel, like looking at a garden hose, not a discrete hole or the side of a vessel. The experts agreed that where the ICA courses behind the sphenoid, it is larger than the one to two millimeter vessel described by appellants.

Experts for both appellants and appellees agreed that where the ICA courses through the sphenoid sinus, no branches of the ICA have been described in the literature, nor have any of them observed any aberrant branches of the ICA in that area. Dr. Mattox acknowledged that if Dr. Burke did get the vessel between the prongs of the bipolar cautery, it was not the ICA itself; however, it was still a vessel that was not supposed to be in the sphenoid. He maintained that people do have anatomical variations, especially in a nose that is inflamed and has excess vascular supply. Dr. Mattox further acknowledged that while there may be some branches of the SPA that go to the sphenoid sinus, it is not a major blood supply to the sphenoid sinus. The SPA comes into the lateral wall of the nose. In removing the polyps, Dr. Brandt would come across the septal branch of the SPA elsewhere in the nose, but not in the sphenoid. Dr. Mattox explained that SPA bleeds can be scary and appear to be a lot of blood, but a person will not bleed to death quickly from a bleed of the SPA. Had the bleeding vessel been the SPA, Tate would have had enough time to get to medical care.

In Dr. Gates' opinion, Dr. Zane's description of "a discrete vessel standing up like a garden hose squirting blood across the sinus" could only be describing the ICA or a branch of the ICA, despite his acknowledgment that it is uncommon for the carotid to have a branch in that area. In Tate's situation, they were not dealing with the SPA because the location is different. Further, he agreed that it was unlikely a person could bleed to death from a bleed from the SPA, due to its small size. Although a bleed of the SPA would be messy, the pressure would drop sufficiently that Tate could have gotten to medical attention before bleeding to death.

Drs. Ansell and White acknowledged that there are discrete vessels that come off the ICA in the area behind the sphenoid; however, they stressed that there are none that normally face the sphenoid. Dr. Ansell explained that those vessels are not always present, and there is no evidence showing they were present in Tate. Dr. Bazan acknowledged that when there is an inflammatory process involved, the body may try to increase the blood flow to control the inflammation, perhaps leading to the growth of new vessels or the increase in size of existing vessels. However, in his opinion, the studies he saw showed that Tate's visible vessels were in the range of normal positioning.

Dr. Ansell testified that severance of the SPA could result in exsanguination if the main trunk was opened, but he could not say whether this happened in Tate's case. The main trunk of the SPA is buried in the bone and is not in the sphenoid. The only published cases where the trunk of the sphenoid was severed are in cases where the bone was being removed. Otherwise, the branches of the SPA in the area of the sinuses are about 1mm or less.

Further, appellants generally disagreed regarding whether the same vessel was involved in all three bleeding episodes. Dr. Zane testified that in his opinion, the bleeding came from the same area of the nose on all three occasions, but he did not know if it came from the same vessel all three times. Drs. Ansell and Burke testified that in their opinions, there were three different bleeds, all unrelated to each other. Dr. Burke specified that he believed the description of what Dr. Zane saw during the second surgery differed from what he saw during the first surgery. Dr. Burke agreed with the description of the location given by Dr. Zane in his postoperative report, and disagreed with Dr. Brandt that the bleeds were all from the same place. Dr. Bertino agreed that all three bleeds came from the same area in the sphenoid, and that it is possible the same vessel bled all three times. He interpreted Dr. Zane's post operative report to describe a branch of the SPA in the lining of the sphenoid sinus that started bleeding. However, because of all the damage done to the structure of the sphenoid, in his opinion, it was impossible for Dr. Zane to know if it was the SPA itself, a branch thereof, or something else.

Dr. Ansell added that in the area where appellees claimed the ICA hemorrhaged, he believed the ICA was surrounded by the cavernous sinus, a venous sinus that is full of blood and protected by a tough membrane. In his opinion, for the ICA to have been injured in this area, the membrane of the cavernous sinus would first have to be punctured, resulting in brisk venous bleeding which could not be controlled with a bipolar cautery and was not described as having occurred.

Dr. Bazan testified that he believed the MRI showed the cavernous sinus surrounding the ICA in the area where the bleed would have occurred in the ICA. In addition, Dr. White agreed that if the ICA had blown out near the sphenoid, the cav-

ernous sinus would be ruptured as well, and testified that during the autopsy, he observed the cavernous sinus to be intact. However, Dr. White also acknowledged that he did not examine the ICA itself near the cavernous sinus or anywhere else.

Appellees' experts disagreed that the cavernous sinus would have to be breached before the ICA could be reached. Dr. Gates testified that while the cavernous sinus surrounds the ICA in some areas, depending on the location of the blow-out, a rupture of the ICA will not necessarily affect the cavernous sinus.

█ It is the role of the jury to resolve the inconsistencies in the testimony and judge the credibility of the witnesses. *See Pickett,* 47 S.W.3d at 74. We conclude that appellees submitted more than a scintilla of evidence to resolve the issues in support of a finding that the bleeding vessel was the ICA or a branch thereof. In addition, we cannot say that the evidence presented by appellants greatly outweighs that presented by appellees, such that the verdict is clearly wrong or unjust. Accordingly, we conclude that the evidence is legally and factually sufficient to support the jury's finding that Tate's bleeding episodes and final hemorrhage were caused by a rupture of his ICA. The first issue of Drs. Brandt and Zane is overruled.

b. Was there a Layer of Bone between the Sphenoid Sinus and the ICA?

In their second issue, Drs. Brandt and Zane contend the evidence is legally and factually insufficient to show that the layer of bone that typically separates the ICA from the sphenoid sinus was absent.

In support of their claim that this layer of bone was absent or so thin as to provide essentially no protection, appellees submitted into evidence the MRI and CT films of Tate's sinuses taken before the first surgery. In conjunction with the films, appel-lees also presented the expert opinions of Drs. Mattox and Gates, who both testified that according to their interpretation of the films, there appeared to be a hole in the bony wall, leaving the ICA exposed in the sphenoid sinus and vulnerable to injury. Dr. Gates noted that if there was any bone present, it was very thin and provided essentially no protection to the ICA. In addition, Dr. Garza–Vale testified that infection such as Tate's can destroy soft tissue in the area, including adjacent bone. He believed that such erosion was visible on Tate's CT and MRI scans and made it more likely that an artery could be injured in the process of cleaning out the sinuses. In addition, appellees presented undisputed testimony that in approximately four to five percent of the population, that bone is anatomically absent. We consider this to be more than a scintilla of evidence. Therefore, we hold the evidence is legally sufficient to support the jury's finding that there was not a layer of bone protecting the ICA.

In opposition to appellees' position, Drs. Ansell and Bazan testified that they could not tell from the MRI scans whether there was bone present or not; however, they believed Tate had a very thin layer of bone between the sphenoid and ICA. Dr. Bazan testified that MRI scans are not the best for showing thin bone because, depending on how you photograph the area, thin bone may or may not appear. Dr. Ansell explained that in situations where a bone is not visible on the MRI films, any bone that is present is less than .5mm thick.

In addition, Dr. Ansell testified that sometimes, through normal development, part of the ICA will actually form a groove in the bony wall. When this happens, the ICA is not actually in the sphenoid, but there is a visible bulge where the ICA is

just on the other side of the bony wall. Dr. Burke testified that, in his opinion, it was apparent from the MRI films that the ICA was bulging into the sphenoid, but he could not tell whether there was bone separating the ICA from the sphenoid. Drs. Bazan and Brandt opined that the ICA did not appear to be bulging into the sphenoid on the MRI films. Dr. Brandt further testified that, in his opinion, the CT scans showed the bone to be very thin in the area in question, but that whether there was some bone, thin bone, or no bone between the sphenoid sinus and the ICA is not really that important because he stayed away from that area. Additionally, Drs. Bazan and Burke agreed that what appellees' experts identified as bone, they believed to be the ophthalmic artery.

We conclude that this evidence does not outweigh the evidence in favor of the jury's finding. Therefore, we hold the evidence is factually sufficient to support the jury's finding that there was not a layer of bone protecting the ICA. The second issue of Drs. Brandt and Zane is overruled.

### c. What Would an Angiogram Have Shown?

In their third issue, Drs. Brandt and Zane contend the evidence is legally and factually insufficient to support the jury's finding that if an angiogram had been performed, it would have shown a treatable condition.

Dr. Garza–Vale explained that an angiogram is a study in which a dye is injected into an artery so that the vasculature will appear on regular x-rays films. Typically, angiograms will show arteries as small as a millimeter, but anything around a millimeter or smaller is very difficult to see. Sometimes arteries can deviate from their normal path and angiograms are done to locate important vascular anatomy before operating in an area close to large vessels.

Dr. Mattox further explained that angiograms show abnormalities such as a dilation, an aneurysm, a pseudoaneurysm, or some other kind of lesion, or the presence of an abnormal branch of a vessel.

Dr. Gates explained that the current generated from a cautery tool creates a coagulation effect that can be used to seal a small vessel. A bipolar cautery is essentially like a pair of tweezers in which the current is controlled between the tips instead of spreading to the surrounding tissue. However, a monopolar cautery has a single hot tip and a ground pad. The current can spread to surrounding tissue and, therefore, has a tendency to be uncontrolled. All the testifying experts agreed that there is concern when using a monopolar cautery next to different nerves, arteries and vessels. When used near a larger vessel such as the ICA, current from an electrocautery can weaken the vessel walls, resulting in a pseudoaneurysm or some other abnormality. Dr. Mattox testified that the use of a monopolar cautery near the ICA causes a risk of damage, "anything from very little [damage] to rupturing the artery, depending on the time and current and how hard you were pressing and a number of variables."

Appellees' experts acknowledged that it was difficult to say exactly what an angiogram would have shown because the test was not performed, but all shared the opinion that an angiogram would have shown the abnormality that eventually led to Tate's death. Drs. Mattox and Gates testified that during both attempts to stop the bleeding in Tate's sinus, a monopolar cautery was used close enough to the ICA to damage the vessel. The attempts at cauterization exposed the area to thermal damage twice. An unappreciated injury would have shown up on an angiogram. Dr. Gates testified that he believed the efforts to repair the bleeding vessel during

the first and second surgeries, involving the use of both monopolar and bipolar cauteries, compromised the ICA and increased the risk of compromise of that vessel in the future.

Dr. Gates explained that this type of damage would not have caused an immediate blow-out, but would have taken a few weeks to show up. Dr. Garza–Vale explained that when damage such as an aneurysm or any pathology that changes the integrity of an arterial wall occurs, although a clot may form to stop the initial bleeding, the continuing repair process will break down the clot so the artery opens up again. For example, in aneurysms, typically there will be a significant rebleed approximately three weeks after the initial bleed.

We conclude there is more than a scintilla of evidence to support the jury's finding that Tate suffered an arterial injury that would have shown up on an angiogram if one had been performed. Therefore, we hold the evidence is legally sufficient.

While appellants and their experts did not dispute the types of abnormalities revealed by angiograms, or that in situations where these abnormalities occur the vessel does not blow-out until several weeks later, appellants did disagree that electrocautery was used close enough to Tate's ICA to create a risk of any damage. Therefore, they argued, it would be purely speculative to say what an angiogram would have shown.

Dr. Ansell did not believe an aneurysm or pseudoaneurysm occurred in this case, and stated that such damage is a rare side effect of this type of surgery. For one to form, some damage must be done to the side of the artery that causes some of the muscle cells to die. He agreed that if a doctor suspected at any time there was damage to the carotid, the standard of care was to get an angiogram. He further

testified that a vessel that has been cauterized with a bipolar cautery will not appear on an angiogram because an angiogram will only show vessels in which blood is currently flowing.

Dr. Bazan testified that an angiogram will not always show a damaged vessel, and often would not be helpful in showing a damaged vessel unless there was active bleeding going on. In his experience, he does not recall doing an angiogram to show a cauterized discrete bleeder such as that described by the defendants. In addition, because there is a period of time after an injury during which the abnormality will not show up on an angiogram, any abnormalities present in Tate may not have been visible. If an angiogram shows nothing unusual the first time, it is not always standard practice to repeat it. Generally, the decision to repeat is made by the surgeons, not the radiologist.

Dr. Garza–Vale testified that in fifteen to thirty percent of cases, an abnormality is visible in the first angiogram. He acknowledged that there is no specific literature calling for sequential angiograms after cauterizing a vessel or when dealing with fungal infections. However, he opined that after the second bleed, the situation changed enough that further investigation was needed.

Dr. Zane testified that before surgery, he was considering the possibility of an angiogram. However, once he saw the bleeding vessel, he no longer had any questions or thought there would be any benefit in doing an angiogram. Because he did not see much benefit, he considered the risks too great just to look around. Further, Dr. Brandt maintained that, because he had not used the monopolar cautery anywhere near the ICA, there was no possibility that a pseudoaneurysm was created.

We cannot say that this evidence greatly outweighs that presented by appellees such that the jury's finding is clearly wrong or manifestly unjust. Therefore, we hold the evidence is factually sufficient to support the jury's finding that an angiogram would have shown a treatable condition. The third issue of Drs. Brandt and Zane is overruled.

#### d. Cause of Death

■ In their fourth issue, Drs. Brandt and Zane contend the evidence is legally and factually insufficient because appellees failed to negate that Tate died of asphyxiation, not massive exsanguination. While a plaintiff is not required to establish causation in terms of medical certainty, nor to conclusively exclude every other reasonable hypothesis, *Krishnan*, 42 S.W.3d at 212, "if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty." *Merrell Dow*, 953 S.W.2d at 720.

Gary Graham, the off-duty sheriff's deputy that Buddy and Brooke stopped and asked for help, testified that the Surbers reached the intersection in Orange Grove around midnight. When Graham, a certified paramedic, approached the truck, Tate was bleeding profusely from his nose and mouth, and was unconscious and unresponsive. Once the ambulance arrived, he accompanied the paramedics and reported that Tate had no pulse, no respirations, and no heartbeat. Tate continued bleeding and when they performed chest compressions, massive amounts of blood came out of Tate's nose and mouth. Graham testified that they tried several times to intubate Tate but were unable to see the opening to the trachea due to all the blood, but at no time did he see any blood clot in the trachea. He further testified that they had trouble establishing an IV because

Tate's vessels were closed off, in his opinion due to a lack of blood in the extremities, and that Tate had no capillary refill, also indicating no circulation in the extremities. By the time the ambulance reached the city limits of Alice, they stopped getting blood during chest compressions, and Tate had essentially stopped bleeding. Graham testified that they suctioned approximately 800 cc. of blood from Tate, and he further estimated there was another 1000 cc. of blood on the floor of the truck, 200 cc. on the seat of the truck, and another 500 cc. on family members and around the rest of the truck, for a total of 2500 cc. of blood, not including whatever blood Tate lost at home.

David Lopez, Jr., one of the paramedics who arrived to assist the Surbers, also estimated that they suctioned between 800 to 1000 cc. of blood while trying to establish an airway, and there appeared to be an additional 1000 to 1500 cc. of blood in the truck. The average adult has between 5000 and 6000 cc. blood volume, and the experts generally agreed that a loss of between 40 to 60 percent of that volume would cause unconsciousness and death. Both Lopez and Graham believed Tate bled to death.

Emergency room records show that Tate was dead upon arrival at Alice Physicians & Surgeons Hospital. He had no circulation in his fingers, no cardiac activity, no carotid pulse, no blood pressure, and exhibited no respiratory activity. In addition, he exhibited severe acrocyanosis, blue coloring in the extremities, indicating poor peripheral circulation. Acrocyanosis occurs late in the evolution of the shock caused by a reduction in blood volume. Dr. Hackley, the emergency room physician on duty when Tate arrived at the hospital, testified that he estimated the extent of blood loss experienced by Tate based on reports from EMS personnel and

observations of the amount of blood on family members and on Tate's body. He concluded that Tate died from massive exsanguination from a massive oronasal hemorrhage.

In further support of massive exsanguination, appellees presented the expert testimony of Dr. Robert Bux, a forensic pathologist. Dr. Bux concluded that Tate bled to death. He reached this conclusion by taking into account the following: (1) the circumstances surrounding the death; (2) the amount of blood lost as evidenced by (a) photographs of Tate's home where he started bleeding, (b) reports from EMS of the amounts of blood in Tate's brother's vehicle, and (c) the amount of blood in the oropharynx; and (3) the amount of time that it took Tate to die once he started bleeding.

Dr. White testified that during the autopsy, he found evidence of early hypoxic changes in the central nervous system, indicating that there was a lack of oxygen to Tate's brain at some point immediately prior to his death. Dr. White acknowledged that this could be considered consistent with massive exsanguination. However, he would not consider blood loss as a possible cause of death without direct evidence of the actual amount of blood that was lost; he would not rely on observations and estimates.

We conclude the evidence supporting the jury's finding that Tate died from massive exsanguination is more than a scintilla. Accordingly, we hold the evidence is legally sufficient.

Dr. Ansell testified it was his opinion that Tate hemorrhaged until he lost consciousness, and then asphyxiated from lack of airway control. He further opined that the acrocyanosis exhibited by Tate is inconsistent with someone dying of exsanguination and explained that because oxygenated blood is red and de-oxygenated blood is blue, when the blood reaching the extremities is de-oxygenated, they turn blue. The significance of this in Tate's case is that sometime after he was clinically dead, blood was still reaching his extremities. If a person had exsanguinated, the body would be pasty white and waxy all over. In addition, the ability to generate a pulse in the ER with chest compressions mitigates against death by exsanguination in his opinion, because in order to generate a pulse with chest compressions, a person needs at least fifty percent of the person's circulating blood volume.

Dr. Bertino testified that he believed Tate's death was caused when a clot dislodged from the sphenoid sinus and fell into his larynx. It occluded Tate's airway, irritated Tate's vocal cords, causing a tight clamping down of the vocal cords called a laryngospasm, and Tate either suffocated or developed an arrhythmia and accompanying cardiac death. Dr. Bertino acknowledged, however, that no evidence of a blood clot in the larynx was found during the autopsy.

Drs. Burke and Zane both testified that they could not say exactly how Tate died. Dr. Brandt acknowledged that during his initial deposition, he said he believed that Tate had bled to death, but explained that opinion was based on what he was told by Dr. Hackley and EMS personnel. At trial, however, he considered exsanguination to be inconsistent with what he knew; rather, he believed that Tate had a massive nose bleed and asphyxiated. He testified that, while losing consciousness is consistent with someone losing a lot of blood quickly, Tate was still bleeding well after he lost consciousness. Dr. Brandt considered this to be inconsistent with someone having lost sixty percent of his blood volume. Dr. Brandt interpreted the inability of the emergency technicians to intubate Tate as indication of a laryngospasm. While Tate

still had sufficient blood supply, there was no oxygen reaching his brain.

During cross-examination, Dr. White testified that he had found no evidence of aspiration when he examined the lungs and airways. Normal lungs weigh between 250–300 grams; Tate's left lung weighed 380 grams and Tate's right lung weighed 400 grams. While the increased weight was due to the presence of blood, that blood was due to common mild congestion and not aspiration. Dr. White opined that testimony from Tate's family and the EMT's who worked on Tate reflect that chest compressions and mouth-to-mouth resuscitation resulted in the rising and falling of Tate's chest, indicating there was a clear pathway to the lungs and that no obstruction was preventing air from reaching the lungs. Further, had there been occlusion of the airways, the blood would have been pushed into the lungs by the efforts at resuscitation, and there was no such blood in the lungs.

Dr. Bux testified that laryngospasms are very rare. He disagreed that one had occurred in this case and might have caused Tate's death. The volume of blood in Tate's lungs was too small to have caused Tate to aspirate. The airway was still open and there was an insufficient amount of blood in Tate's lungs to cause him to suffocate.

We do not consider the controverting evidence presented by appellants to significantly outweigh the evidence showing that Tate died from massive exsanguination. Further, appellees offered sufficient evidence for the jury to negate with reasonable certainty asphyxiation as a plausible cause of death. Accordingly, we conclude the evidence is factually sufficient to support a finding that Tate died from massive exsanguination. The fourth issue of Drs. Brandt and Zane is overruled.

## C. FORESEEABILITY

In their fifth issue, Drs. Brandt and Zane contend the evidence is legally and factually insufficient to support the jury's finding that the harm to Tate was foreseeable.

For an injury to be foreseeable, "a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex.1995) (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549–50 (Tex.1985)). Harm is foreseeable "if the injury 'might reasonably have been contemplated' as a result of the conduct." *Id.* (citing *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex.1980)). However, foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury. *Id.* (citing Restatement (Second) of Torts § 435(2) (1965)).

All the testifying experts agreed that (1) typically, when a vessel is cauterized with a bipolar cautery, it is not expected to rebleed, and (2) an angiogram was not indicated after the bleeding incident during Tate's initial surgery. However, Drs. Garza–Vale, Mattox, and Gates stressed that the second significant bleed should have caused concern and indicated a more serious problem that required further investigation.

Dr. Garza–Vale testified that, regardless of which vessel the defendants believed to be bleeding, any arterial hemorrhage of the magnitude experienced by Tate is significant, and arterial bleeds of that type will recur if not properly treated. He stressed that the erosion of the bone between the ICA and the sphenoid made it more likely that an artery could be injured

in the process of cleaning out the sinuses. When a patient has had two significant arterial bleeds from the sphenoid sinus area, the patient likely will rehemorrhage. Therefore, Tate's final bleed was a foreseeable event.

Dr. Mattox testified that when the defendants encountered abnormal arterial bleeding in the sphenoid sinus, it should have signaled that further investigation needed to be conducted. Dr. Mattox interpreted the surgical notes of Drs. Burke and Brandt as indicating that they knew they had a bleeder in the area of the ICA, though they did not think it was the ICA itself. If the bleeder was possibly part of the ICA, attempts at cauterization could cause some damage. Dr. Mattox testified that after two such significant bleeds from the same place in the lateral wall of the sphenoid sinus, there was a risk of bleeding again because (1) inflamed, infected tissue does not have the same healing capacity as normal tissue, and (2) the bleeding was in a very critical area. He opined that if they did not know exactly where the bleeding was coming from, it should have been investigated further.

Dr. Gates acknowledged it was reasonable on the occasion of the first bleed for appellants to not be concerned about the ICA. However, the second serious bleeding incident changed everything, and appellants should have been alerted to the possibility of larger potential problems. He opined that because the ICA was bare, there was nothing to protect it from the effects of the monopolar cautery, and the location of the bleeding, as described in the medical records, indicated the doctors knew they were using cautery tools in close proximity to the ICA. Therefore, the risk of aneurysm or rupture was very high. When there is a serious bleed in the region of a major artery such as the ICA, that is a warning sign to do something, and

the end result of another massive bleed was foreseeable.

We conclude there is more than a scintilla of evidence to support the jury's finding that the harm to Tate was foreseeable. Accordingly, we hold the evidence is legally sufficient to support the finding.

The medical records admitted into evidence show that during the first surgery, Tate lost approximately 200–250 cc. of blood, and during the second surgery, he lost approximately 200–400 cc. of blood. While the experts universally agreed that this was a significant amount of blood to be lost through the nose, experts for appellants disagreed that it was massive epistaxis and, thus, a warning bleed. Dr. Ansell testified that in his opinion, there was no reason for appellants to have worried that Tate was going to come back with a more significant, possibly fatal hemorrhage. He explained that a warning bleed is usually massive and requires packing to control; in Tate's case, Dr. Zane easily controlled the bleed with cauterization. Had this been a warning bleed brought on by damage done to the ICA during the first surgery, he believed Dr. Zane's effort to stop the second bleed would have resulted in an immediate rupture of the damaged ICA. Had Tate made it to the hospital with the third bleeding episode, Dr. Ansell would have performed an angiogram, but he did not think one was called for after the first two bleeds. In his opinion, it was reasonable for appellants to conclude that if Tate rebled, he would have a chance to come back in for treatment.

Dr. Brandt testified that while he did not know which vessel bled on either of the first two occasions, he thought the probability was low that it would bleed again. If Tate did bleed again, Dr. Brandt believed that Tate would have enough time to get to the hospital. Dr. Brandt insisted there

was no way they could have foreseen that Tate would have another bleed and die.

Dr. Zane opined that the bleed on October 3 was completely different from a warning bleed. A warning bleed usually involves a pseudoaneurysm in the side wall of an artery, but this was a single discrete vessel. Although Tate lost a significant amount of blood, in Dr. Zane's opinion, the second bleed was not massive epistaxis, and what happened to Tate was not foreseeable.

Dr. Bertino testified that controlling a bleeding vessel such as the one described by Dr. Zane with a bipolar cautery is a common practice among ENTs and neurosurgeons. If the surgeon has been able to identify the bleeding vessel and control it, there is no need to do anything else, such as an angiogram. In Dr. Bertino's opinion, there was no way for Drs. Brandt or Zane to foresee what would happen to Tate.

We cannot say that the controverting testimony presented by appellants greatly outweighs the evidence in favor of the jury finding. Accordingly, we hold the evidence is factually sufficient to support the jury's finding that the harm to Tate was foreseeable. The fifth issue of Drs. Brandt and Zane is overruled.

We have held the evidence of "cause-in-fact" and "foreseeability" to be legally and factually sufficient. Consequently, we hold that the evidence establishing proximate cause is both legally and factually sufficient. Dr. Burke's second issue is overruled.

### D. DUTY

In his first issue, Dr. Burke contends that (1) appellees failed to establish that Dr. Burke owed a duty to Tate to act according to a certain standard of care, and (2) appellees failed to establish that Dr. Burke breached the applicable standard of care.

Whether Dr. Burke owed a duty to Tate to act according to a certain standard of care is a question of law which we must decide before addressing the substance of that standard. *St. John v. Pope*, 901 S.W.2d 420, 424 (Tex.1995) (citing *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex.1994)). "The duty to treat the patient with proper professional skill flows from the consensual relationship between the patient and physician, and only when that relationship exists can there be a breach of a duty resulting in medical malpractice." *Id.* at 423; *Ramirez v. Carreras*, 10 S.W.3d 757, 761 (Tex.App.-Corpus Christi 2000, pet. denied).

Dr. Burke initially saw Tate on September 17 for a neurosurgical consultation at the request of Dr. Brandt. On September 25, Dr. Burke performed a bifrontal craniotomy and cranialization of Tate's frontal sinus, and assisted Dr. Brandt in controlling the spontaneous bleeding that occurred at the end of the surgery. We consider these actions more than sufficient to create a consensual physician-patient relationship between Dr. Burke and Tate. That relationship imposed a duty on Dr. Burke to act as "a reasonable and prudent doctor" would have acted "under the same or similar circumstances." *Hood v. Phillips*, 554 S.W.2d 160, 165 (Tex.1977) (citing *Snow v. Bond*, 438 S.W.2d 549, 550 (Tex.1969)). This duty applied not only to Dr. Burke's actions during Tate's surgery, but also to his post-operative care of Tate. *See Webster v. Johnson*, 737 S.W.2d 884, 887 (Tex. App.-Houston [1st Dist.] 1987, writ denied).

Dr. Burke asserts that because he was not present at the second surgery performed after Tate was brought to the emergency room, he was no longer under

any duty of care with regard to Tate's treatment. We disagree. On October 3 when Tate arrived at Spohn Hospital with the second bleed, Dr. Burke was just leaving the hospital after checking on patients and passed Dr. Zane on his way out. Upon later discovering that Dr. Zane was there to work on Tate, Dr. Burke called Dr. Zane to discuss both the first surgery and what Dr. Zane could expect to find. He told Dr. Zane that there were no issues during the first surgery that would complicate any plan Dr. Zane had to control the current bleed, and informed Dr. Zane that the first bleed had been a discrete bleed and he had cauterized it; it was simply a vessel in the lining of the nose and was not a problem with the ICA or any part of the brain. He offered to come to the hospital if he was needed. Although Dr. Burke was not present at the second surgery, he remained proactive in Tate's care. *See St. John,* 901 S.W.2d at 424 ("The fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship."); *Wax v. Johnson,* 42 S.W.3d 168, 172 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) ("Texas courts have recognized the existence of a duty only when the physician was party to a contract for the benefit of the patient or had taken an active step in treating the patient."). In addition, Dr. Burke saw Tate on October 15 for a follow-up visit, and scheduled a final follow-up visit for three months later. We conclude that the physician-patient relationship persisted between Dr. Burke and Tate, and Dr. Burke retained his duty to Tate to act as a reasonable and prudent doctor after Tate's second surgery.

■ We have already held that there is legally and factually sufficient evidence to show that the bleeding vessel was the ICA or a branch thereof, that an angiogram would have shown a treatable condition, and that the harm to Tate was foreseeable. What remains to be determined is whether the standard of care required Dr. Burke to order an angiogram. *See Gonzales v. Outlar,* 829 S.W.2d 931, 934 (Tex.App.-Corpus Christi 1992, no writ) (noting that the standard of care must be established "so that the fact finder can determine whether the physician's act or omission deviated from the standard of care to the degree that it constituted negligence or malpractice.").

Dr. Garza–Vale, appellees' neurosurgical expert witness, testified he believed that because all three appellants were aware of the second bleed, it was the responsibility of all three appellants to decide to perform an angiogram or a series of angiograms to determine the cause. He explained that because Dr. Burke was not at the hospital for the second surgery, he could not criticize him with regard to appropriate steps to be taken at that time; however, at the follow up appointment on October 15, Dr. Burke was not only aware of the second bleeding episode, but the symptoms described by Tate—mild neck pain, tiredness and dizziness, and nausea when standing up—should have alerted Dr. Burke to further problems and caused concern that something was potentially wrong with the vascular system. Dr. Garza–Vale acknowledged that while the standard of care for symptoms of that nature alone do not call for an angiogram, the standard of care for those symptoms in conjunction with knowledge of the second serious bleed, required further investigation.

We consider this more than a scintilla of evidence establishing that the standard of care required Dr. Burke to order an angiogram. Accordingly, we hold the evidence is legally sufficient to support the jury's finding that Dr. Burke violated the standard of care owed to Tate.

Dr. Ansell, appellants' neurosurgical expert, testified that in his opinion, there was

no reason for Dr. Burke to have been present during Tate's second surgery and no reason to expect that an ENT would not be able to deal with a bleed in this area. In Dr. Ansell's opinion, it was reasonable, possibly important, for Dr. Burke to have told Dr. Zane that it was not the ICA that bled during the first surgery.

Dr. Burke testified that, in his opinion, the area Dr. Zane was working in was not a neurosurgical area. After the second surgery, he was informed by his associate that a bleeder was found and controlled and that there were no neurosurgical issues. He was not given any further information and did not inquire any further. He believed there was no reason to think that anything had been left out or that anything additional needed to be done. He was not involved in any discussions with the family about whether additional tests should be done, and he was never asked for his input regarding whether to conduct additional tests.

We cannot say that Dr. Burke's evidence that the standard of care did not require him to order an angiogram so overwhelms the evidence presented by appellees that the jury finding that Dr. Burke violated the requisite standard of care is clearly wrong and unjust. Therefore, we conclude that the evidence is factually sufficient to support the jury's finding that Dr. Burke violated the standard of care owed to Tate. Accordingly, Dr. Burke's first issue is overruled.

### III. Admission of Expert Testimony

In their sixth issue, Drs. Brandt and Zane contend the trial court erred by admitting appellees' expert testimony. Drs. Brandt and Zane assert the testimony was not reliable under Texas Rule of Evidence 702.

Under rule 702, an expert must be properly qualified and his opinion must be relevant and based upon a reliable foundation.[1] TEX.R. EVID. 702; *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995). Whether the expert and the proffered testimony meet these requirements is a preliminary question within the discretion of the trial court. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995); *Robinson,* 923 S.W.2d at 556; *see also* TEX.R. EVID. 104(a). In reviewing the trial court's decision, we look only to whether or not the trial court abused its discretion by acting without reference to any guiding rules or principles, leading to a result that is arbitrary and unreasonable. *Robinson,* 923 S.W.2d at 558; *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241 (Tex. 1985). An abuse of discretion does not exist merely if the reviewing court would have ruled a different way under the same circumstances. *Loftin v. Martin,* 776 S.W.2d 145, 146 (Tex.1989) (orig.proceeding).

When determining whether proffered expert testimony is reliable, the trial court must evaluate "the methods, analysis, and principles relied upon in reaching the opinion ... to ensure that the opinion comports with applicable professional standards outside the courtroom." *Gammill v. Jack Williams Chevrolet,* 972 S.W.2d 713, 725–26 (Tex.1998). "Scientific evidence which is not grounded 'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.'" *Robinson,* 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). However, the role of the trial court "is not to determine whether an expert's conclusions are

1. Appellants do not challenge the qualifica- tions of appellees' expert witnesses.

correct, but only whether the analysis used to reach them is reliable." *Gammill*, 972 S.W.2d at 728; *see also Robinson*, 923 S.W.2d at 557 ("Rule 702 envisions a flexible inquiry focusing solely on the underlying principles and methodology, not on the conclusions that they generate.").

In examining expert testimony that is purely scientific, the supreme court has outlined six non-exclusive factors to help trial courts determine whether such testimony is reliable.[2] *See Robinson*, 923 S.W.2d at 557. However, the particular "factors a trial court will find helpful in determining whether the underlying theories and techniques of the proffered evidence are scientifically reliable will differ with each particular case." *Id.* The Texas Supreme Court has recognized that "there are many instances when the relevance and reliability of an expert witness's testimony are shown by the witness's skill and experience." *Gammill*, 972 S.W.2d at 722. In these cases, the factors suggested by the supreme court "simply do not fit testimony like that offered." *Id.* at 724. Nonetheless, in these circumstances, the trial court "is not relieved of its responsibility to evaluate the reliability of the testimony in determining its admissibility." *Id.* When an expert opinion is based on the experience of the expert alone, the trial court must determine if there is a sufficient connection between the existing data and the opinion offered, or if there is "simply too great an analytical gap" for the expert testimony to be considered reliable. *Id.* at 726 (quoting *Gen. Elec. Co. v.*

*Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

The party offering expert testimony bears the burden to prove that the witness is qualified under rule 702. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996); *Boren v. Bullen*, 972 S.W.2d 863, 865 (Tex.App.-Corpus Christi 1998, no pet.). The trial court held a pre-trial hearing to determine whether the expert testimony proffered by appellees was sufficiently reliable. At the hearing, the trial court had for its consideration (1) the curriculum vitae of the experts showing their qualifications, (2) the depositions of the experts containing the opinions they were to offer to the jury, and (3) the medical records and deposition testimony upon which those opinions were based. The trial court concluded that (1) the opinions offered by appellees' experts were closely related to their experience in the medical profession and their observations in the medical field, and (2) because the opinions were based on objective facts and not speculation, there was a sufficient connection to make the opinions reliable.

In our analysis of the legal and factual sufficiency of the evidence, we extensively discussed the testimony offered by both sides, and we agree with the trial court that the expert opinions were based on the application of their experience in the medical field to the objective information contained in the medical records of the deceased. Because the expert opinions are based on the experience of the experts, the *Robinson* factors are not applicable. *See Gammill*, 972 S.W.2d at 724–26. However, appellees were still required to show

---

2. The six non-exclusive factors listed by the Texas Supreme Court are: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) wheth-er the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses which have been made of the theory or technique. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995).

that there was a sufficient connection between the experts' interpretation of the data contained in the medical records and the opinions offered. *See id.* at 726.

Our review of the record reveals that appellees' experts are all highly qualified and have extensive experience in their respective fields,[3] and that the experts for both appellees and appellants based their opinions on the objective data contained in the medical records of the deceased. However, while the experts were all working with the same objective data, they differed in their interpretations of that data. Appellees' experts understood Tate's medical records to illustrate an underlying factual situation different from that deduced by appellants. We conclude that the differences in opinion expressed

by the testifying experts resulted not from the application of any flawed methodology, but on their differing conclusions as to the underlying factual situation. The resolution of these factual disputes is within the province of the jury. *See City of Keller v. Wilson,* 168 S.W.3d 802, 820 (Tex.2005). The jury's resolution of those factual issues thereby determines the probative value of the proffered expert testimony. *See Tex. Workers' Compensation Comm'n v. Garcia,* 893 S.W.2d 504, 529 (Tex.1995) (recognizing that "juries have been free to consider conflicting expert testimony on a particular issue and, using its judgment as the finder of fact, blend that testimony to arrive at a proper verdict.").

We conclude that appellants' arguments against appellees' expert testimony goes to

---

3. Dr. Garza–Vale is board certified in the area of neurosurgery and has been a neurosurgeon with the Texas Neurosciences Institute for 17 years. He has extensive experience with surgeries involving the sinuses, and has operated in conjunction with otolaryngologists in procedures similar to the one at issue. In his practice he regularly uses MRI and CT imaging tests, and interprets the films himself.

Drs. Mattox and Gates are both board certified in the area of otolaryngology, and have served on the editorial boards of scholarly journals and published numerous scholarly articles. Dr. Mattox has served as a professor at the University of Texas Health Science Center in San Antonio and at Johns Hopkins University School of Medicine. He is also a member of the American Academy of Otolaryngology and a Fellow of the American College of Surgeons. At the time of trial, he was serving as the chair of otolaryngology and neck surgery at Emory University, teaching medical students and residency programs.

Dr. Gates started the otolaryngology department at the University of Texas Health Science Center in San Antonio where he served for 18 years. He has also served as an instructor of otolaryngology at the University of Michigan, Chairman of the Department of Otolaryngology and Director of Research at Washington University School of Medicine in St. Louis, and as a professor of otolaryngolo-

gy at the University of Washington School of Medicine. He has been honored by the American Academy of Otolaryngology, Head and Neck Surgery. He is a member of numerous professional societies, has edited textbooks in the area of otolaryngology, and frequently lectures on topics in the area of otolaryngology.

Dr. Hackley received his medical degree from Ohio State University in 1976. After completing his internal medicine residency and internship at the University of Cincinnati and Good Samaritan Hospital in Cincinnati, Ohio, he moved to Dallas where he practiced emergency medicine for three years. He operated a private practice in internal medicine from 1981 through 1993, after which he once again began practicing emergency medicine.

Dr. Bux is board certified in anatomical pathology, clinical pathology, and forensic pathology. He has been the deputy chief medical examiner for Bexar County since 1992 where he spends most of his time working to determine the manner and means of death. He is a member of the National Association of Medical Examiners and a Fellow of the American Academy of Forensic Sciences. He has served as an instructor for EMTs and paramedics in San Antonio, and is a clinical assistant professor with the UT Health Science Center. In addition, he has served on the editorial board of the American Journal of Forensic Pathology and Medicine, and has published works in his area of specialty.

the weight to be given the testimony, not its reliability. Accordingly, we hold the trial court did not abuse its discretion in admitting the expert testimony proffered by appellees. The sixth issue of Drs. Brandt and Zane is overruled.

## IV. Motion for New Trial

■ In the seventh issue of Drs. Brandt and Zane and the third issue of Dr. Burke, appellants contend the trial court erred by denying their motion for new trial. The decision to grant or deny a motion for new trial lies within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Brown v. Hopkins,* 921 S.W.2d 306, 311 (Tex.App.-Corpus Christi 1996, no pet.) (citing *Jackson v. Van Winkle,* 660 S.W.2d 807, 809 (Tex.1983)). A trial court abuses its discretion when it is clear from the record that its decision was arbitrary and unreasonable. *Id.* (citing *Simon v. York Crane & Rigging Co.,* 739 S.W.2d 793, 795 (Tex.1987)).

On the third day of trial, the *Corpus Christi Caller–Times* published on its editorial page a letter to the editor written by Jack Modesett, III, one of appellees' attorneys.[4] Appellants assert the jury was aware of the editorial, they discussed it during deliberations, and the editorial influenced their decision. Appellants contend this constituted (1) juror misconduct and/or (2) improper communication with the jury.

■ Whether jury misconduct occurred and caused injury is a question of fact for the trial court. *Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362, 372 (Tex.2000); *Pharo v. Chambers County, Texas,* 922 S.W.2d 945, 948 (Tex.1996). To warrant the granting of a new trial based on juror misconduct or improper communication to the jury, appellants must show that (1) the misconduct occurred, (2) it was material, and (3) it probably caused injury. *Golden Eagle,* 24 S.W.3d at 372; TEX.R. CIV. P. 327(a).

### A. JUROR MISCONDUCT

In support of their allegation of juror misconduct, appellants relied solely upon the affidavit of juror David Garcia, in which he stated that (1) during the trial of the case, he witnessed some of the jurors reading newspapers, and (2) during deliberations two jurors mentioned that they had read something in the newspaper related to the case. Appellees assert that Juror Garcia's affidavit is incompetent under rule 327(b). We agree.

■ Juror testimony is limited to "whether any outside influence was improperly brought to bear upon any juror." TEX.R. CIV. P. 327(b); *see also* TEX.R. EVID. 606(b). Under this rule, a juror may testify about "improper contacts with individu-

---

4. The text of Modesett's letter provides, in relevant part, as follows:

The major problem [in medical malpractice cases] is that many physicians do nothing when they become aware of malpractice or of a physician who simply provides bad care. The failure of the medical community as a whole to discipline its own ranks is at the heart of many malpractice cases. Physicians can and do [commit] malpractice regularly with no repercussions other than increased malpractice premiums. The repercussions for the patients are far more severe and often result in death.

The malpractice problem is further exacerbated when fellow physicians fail to come forward and honestly testify in malpractice cases against malpracticing doctors, even when the malpractice is obvious.

The problem with medical malpractice in Corpus Christi and indeed the nation as a whole is not with the number of lawsuits, but with the number of malpracticing doctors.

als outside the jury," or "matters or statements not occurring during the course of the jury's deliberations." *Golden Eagle,* 24 S.W.3d at 370. However, a juror "may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions...." Tex.R. Civ. P. 327(b); *see Golden Eagle,* 24 S.W.3d at 370.

 An outside influence "must emanate from outside the jury and its deliberations." *Soliz v. Saenz,* 779 S.W.2d 929, 931–32 (Tex.App.-Corpus Christi 1989, writ denied); *King v. Bauer,* 767 S.W.2d 197, 198 (Tex.App.-Corpus Christi 1989, writ denied). An outside influence does not include "information not in evidence, unknown to the jurors prior to trial, acquired by a juror and communicated to one or more other jurors between the time the jurors received their instructions from the court and the rendition of the verdict;" nor does it include "[i]nformation gathered by a juror and introduced to the other jurors by that juror, even if the information were introduced specifically to prejudice the vote...." *Soliz,* 779 S.W.2d at 932. This Court has explicitly held that "discussion of newspaper articles is not considered an outside influence." *King,* 767 S.W.2d at 198.

 Garcia's affidavit stating that other jurors discussed newspaper articles during deliberations was not evidence of any outside influence, but only described matters on the minds of other jurors during deliberations. The affidavit is, therefore, incompetent to serve as evidence of juror misconduct. *See* Tex.R. Civ. P. 327(b) (stating that juror's affidavit "concerning matters about which he would be precluded from testifying" may not be re-

ceived as evidence). Because appellants have submitted no evidence tending to show juror misconduct, we conclude the trial court did not abuse its discretion in determining that none took place.

### B. IMPROPER COMMUNICATION

 In arguing that Mr. Modesett's letter to the editor constituted improper communication, appellants urge us to find that the "potential for prejudice" created by the letter was too great a risk.

To support their proposition that the presence of a newspaper article creates too great a potential for prejudice, appellants rely heavily on *Henslee v. United States,* 246 F.2d 190 (5th Cir.1957), and *United States v. Coast of Maine Lobster Co.,* 538 F.2d 899 (1st Cir.1976). We find these cases to be inapposite. Both cases involved mid-trial publicity during federal criminal prosecutions and relied heavily on the higher standards of conduct imposed on a United States Attorney due to his special role in the justice system. *See Henslee,* 246 F.2d at 193; *Coast of Maine,* 538 F.2d at 902–03. Because the matter before us does not involve the actions of a United States Attorney, we do not find these cases to be instructive.

 In addition, appellants rely heavily on the Texas Disciplinary Rules of Professional Conduct. We note, however, that these rules were "not designed to be standards for procedural decisions." Tex.R. Prof. Conduct Scope; *see also Primrose Operating Co. v. Jones,* 102 S.W.3d 188, 193 (Tex.App.-Amarillo 2003, pet. denied). We, therefore, apply the standard established by rule 327(a) of the Texas Rules of Civil Procedure for determining whether to grant a mistrial based on improper communication.[5] *See* Tex.R. Civ. P. 327(a).

---

**5.** In resolving this issue, we express no opinion as to the propriety of Mr. Modesett's editorial, or any other publicity occurring during

Appellants urge that Mr. Modesett's editorial was so highly prejudicial that it establishes prima facie harm sufficient to warrant the granting of a new trial. While rule 327 generally requires that a party must show that "injury probably resulted," *see* Tex.R. Civ. P. 327(a), the Texas Supreme Court has determined that under some circumstances it may be necessary to draw "logical inferences of prejudice and unfairness from the overt act itself, for an action or occurrence may be so highly prejudicial and inimical to fairness of trial that the burden of going forward with proof of harm is met, prima facie at least, by simply showing the improper act and nothing more." *Tex. Employers' Ins. Ass'n v. McCaslin*, 159 Tex. 273, 317 S.W.2d 916, 921 (1958).

However, cases where courts have found prima facie harm involved social interaction with jurors which, while under normal circumstances may constitute no more than common courtesy, may have a "tendency to create a feeling of obligation such as should not be permitted between litigant and juror in the delicate matter of the trial of a lawsuit." *Tex. Milk Prod. Co. v. Birtcher*, 138 Tex. 178, 157 S.W.2d 633, 634, 636 (1941) (finding prima facie harm where party purchased soft drink for juror at store across from courthouse); *see also McCaslin*, 317 S.W.2d at 921 (finding prima facie harm where party went to place of employment of juror and said "Be sure and do all you can to help me"); *Tex. Employers' Ins. Ass'n v. Brooks*, 414 S.W.2d 945, 946 (Tex.Civ.App.-Beaumont 1967, no writ) (finding prima facie harm where juror requested and received ride home from plaintiff after both first and second days of trial); *Occidental Life Ins. Co. v. Duncan*, 404 S.W.2d 52, 53 (Tex.Civ. App.-San Antonio 1966, writ ref'd n.r.e.) (finding prima facie harm where plaintiff

asked juror for aspirin, thereby "conveying to the juror that he was in pain and needed the aspirin to relieve his pain"). The presence of Modesett's editorial did not involve any personal contact between the attorney and the jurors, nor did it confer any type of special favor or attention. We conclude that the bare presence of the editorial in the local newspaper is insufficient to establish prima facie harm.

The only evidence presented by appellants to show actual harm was the affidavit of juror David Garcia, which we have already concluded is incompetent to serve as evidence. Appellants have failed to provide any evidence that they suffered injury. Therefore, we conclude that it was not an abuse of discretion for the trial court to deny appellants' request for a new trial.

The seventh issue of Drs. Brandt and Zane is overruled. Dr. Burke's third issue is overruled.

The judgment of the trial court is AFFIRMED.

Dissenting Opinion by Justice CASTILLO.

CASTILLO, Justice, dissenting.

With respect to Dr. Burke's first issue presented, I would hold that the evidence is legally insufficient to prove the standard of care and breach of that standard. With respect to Dr. Zane's seventh issue presented, I would hold that the record demonstrates prima facie harm. Accordingly, I respectfully dissent.

## I. Background

Twenty-six years old at the time, Mr. Surber presented to Dr. Brandt with advanced, progressive sinus disease that by that time had led to blindness in one eye. After a CT scan and an MRI, Mr. Surber

the trial of this case, under the Texas Disciplinary Rules of Professional Conduct.

underwent surgery for, in part, removal of diseased tissue and polyps to facilitate breathing, among other things. Dr. Burke assisted Dr. Brandt to stop a bleeder during the surgery. After release from the hospital, Mr. Surber subsequently presented for emergency treatment because of a bleed (hereafter, the "October 3" episode).[1] On call for Dr. Brandt, Dr. Zane reviewed the MRI and CT scans taken at the initial hospitalization. Prior to surgery, Dr. Zane conferred by telephone with Dr. Burke regarding the first surgery bleed and, during surgery, located the bleeder and contained it. Dr. Burke was not part of the surgical team for the October 3rd surgery or for follow up to that surgery.[2] Subsequently, Mr. Surber appeared for a previously set appointment with Dr. Burke for removal of surgical staples from the first surgery, but the staples had already been removed.[3] Mr. Surber apprised Dr. Burke of the events leading to the second surgery and his current symptoms. Dr. Burke released him from his care. Several days later, Mr. Surber suffered another bleed at home and expired en route to the hospital. Suit was brought and the case was tried to a jury on issues of medical negligence.

After an adverse jury verdict, Dr. Zane and Dr. Burke present several issues for our decision. Those issues include whether reasonable minds could differ on the proximate cause of Mr. Surber's death. With regard to Dr. Zane and Dr. Burke, appellants maintain that they should have performed an arteriogram because it is foreseeable to an otolaryngologist and a neurosurgeon, respectively, that failing to order an arteriogram will result in the failure to determine the existence or not of an aneurysm or pseudo-aneurysm in an artery. They additionally argue that had an arteriogram been performed, the doctors could have seen a defect in an artery[4] and taken steps to prevent the fatal bleed.

Appellees state that they "contended that Appellants should have performed an angiogram[5] after the *second* surgery, on October 3." (Emphasis original). Appellees recognize that, to show proximate cause, they must have shown that the arteriogram, if performed, would in reasonable medical probability have resulted in the institution of medical treatment which would have prevented Mr. Surber's death.[6] They contend that they have done so by the testimony of their experts because they need only prove that a physician using reasonable prudence could

1. Three key dates are material. On September 25, 1998, Dr. Brandt and Dr. Burke performed surgery. On October 3, 1998, Dr. Zane performed a second surgery. On October 15, 1998, Dr. Burke had a post-operation visit with Mr. Surber with respect to the September 25, 1998 surgery.

2. In a civil case, we accept as true the facts stated unless another party contradicts them. *See* TEX.R.APP. P. 38.1(f).

3. On the same day, Mr. Surber saw Dr. Brandt.

4. In their brief, appellees maintain that it is not essential to the judgment that the evidence support a finding that the ICA was the

artery involved and assert that the doctors were negligent regardless of which artery hemorrhaged. Appellees' experts appeared to agree that the stage of the disease had compromised Mr. Surber's vascular system. As to the first surgery, Dr. Garza–Vale conceded that the doctors involved would be in the best position to know whether a major vessel bled.

5. The jury heard that the terms angiogram and arteriogram are synonymous.

6. Without reference to the record, appellees state that, even if an arterial defect would not appear on the arteriogram immediately after the injury, the injury that caused the defect in this case occurred on September 25, during the first surgery.

have foreseen that Mr. Surber would suffer a hemorrhage if an arteriogram were not performed and the defect in the artery corrected.

## II. Dr. Burke [7]

By his first issue, Dr. Burke asserts that the evidence does not prove the standard of care and that he breached any standard of care. Dr. Burke asserts that he had no duty to order an arteriogram because he did not participate in the October 3 surgery or treatment, was not consulted, and did not make any decisions with regard to that surgery or whether an arteriogram was indicated. Appellees counter that if Dr. Burke and Dr. Zane had acted prudently under the circumstances (including Mr. Surber's likely anatomical abnormality due to advanced sinus disease), they probably would have prevented Mr. Surber's death by performing "an arteriogram which would probably have revealed whatever defect existed." Appellees maintain that they did not have to prove which defect existed because an arteriogram "would probably have revealed it, whatever it was." They further posit that, even if one arteriogram failed to reveal a defect, the standard of care required sequential arteriograms, indicated by the two bleeds. In particular, as to Dr. Burke, appellees contend that, when Mr. Surber presented to him for follow-up after the second bleed, Dr. Burke was required to order an arteriogram.

### A. Scope and Standard of Review

A contention that there is no evidence of an applicable standard of care in a health care liability suit is a granulation of the contention that there is no evidence of negligence. *Battaglia v. Alexander,* 177 S.W.3d 893, 899 (Tex.2005). One element required to prove a medical negligence claim is evidence of the applicable standard of care, which usually requires expert testimony. *Id.; Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1966). Therefore, in our review of the record we must consider both the evidence of negligence and the more specific subsidiary question of whether a standard of care was established. *See Battaglia,* 177 S.W.3d at 899. The medical standard of care must be established so that the fact finder can determine whether the physician's act or omission deviated from the standard of care to the degree that it constituted negligence or malpractice. *See Rodriguez v. Reeves,* 730 S.W.2d 19, 21 (Tex.App.-Corpus Christi 1987, writ ref'd n.r.e.). The plaintiff must establish from expert testimony (1) the standard of care, and (2) the facts which show that the physician deviated from that standard. *Id.* It necessarily follows that she must also show that the decedent's death was proximately caused by such deviation. *Id.* The fact finder would then decide whether the deviation was of such degree that it constituted negligence or malpractice. *Id.*

The burden of proof, then, in a medical malpractice case is on the patient to prove

---

7. Dr. Burke presents three issues:
 1. There was no evidence or, alternatively, insufficient evidence to support the jury's finding that he was negligent.
 (a) appellees failed to establish Dr. Burke's duty to act according to a certain standard of care; and
 (b) appellees failed to establish that he breached the applicable standard of care.
 2. The evidence was legally and factually insufficient to support the proximate

cause finding of the jury. Testimony by appellees' experts was legally and factually insufficient to support the proximate cause finding because it was unreliable.
 3. Jury misconduct in this case warrants a new trial. Improper jury contact in this case was harmful error as a matter of law and requires that the Court grant a new trial.

that the physician has undertaken a mode or form of treatment which a reasonable and prudent member of the medical profession would not have taken under the same or similar circumstances. *Bauer v. King,* 700 S.W.2d 650, 651 (Tex.App.-Corpus Christi 1985, no writ) (citing *Hood v. Phillips,* 554 S.W.2d 160, 165–66 (Tex. 1977)).

It is the jury's role to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Owens v. Perez,* 158 S.W.3d 96, 110 (Tex.App.-Corpus Christi 2005, no pet.). In determining the sufficiency of the evidence, appellate courts must accept the jury's resolution of any conflicts or inconsistencies in the evidence. *Id.* In reviewing a verdict for legal sufficiency, we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). In this case, Dr. Burke did not bear the burden of proof at trial. *See Holloway v. Skinner,* 898 S.W.2d 793, 795–96 (Tex. 1995); *see also Kingston v. Helm,* 82 S.W.3d 755, 763 n. 3 (Tex.App.-Corpus Christi 2002, pet. denied). Thus, we analyze his legal-sufficiency challenge in his first issue as a no-evidence issue. *See Gooch v. Am. Sling Co.,* 902 S.W.2d 181, 183 (Tex.App.-Fort Worth 1995, no writ). Dr. Burke must show that the record presents no evidence to support the adverse finding. *See Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). Specifically, he must show that the record presents no probative evidence to support the essential facts as to the applicable standard of care

and breach of that standard. *See Holloway,* 898 S.W.2d at 795; *see also Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Hines v. Comm'n for Lawyer Discipline,* 28 S.W.3d 697, 701 (Tex.App.-Corpus Christi 2000, no pet.).

### B. The Record

Appellees recognize that they must have shown proof of a standard of care and breach of that standard. They maintain they have done so by the testimony of their experts, Drs. Gates, Mattox, and Garza–Vale. Appellees concede that their experts, Drs. Gates and Mattox, admitted that Dr. Burke was not negligent in failing to perform an arteriogram on October 3 because he was not present. Appellees assert, however, that Dr. Burke had an "independent responsibility" to order an arteriogram in view of Mr. Surber's pathology and history.[8] Appellees refer to Dr. Garza–Vale's testimony as follows:

Q.... [D]o you believe that the standard of care required all of these Defendants to perform an angiogram after the October 3rd '98 bleed, serially, if necessary, anytime up until the time of his death?

A. Certainly I think it would have been the prudent thing to do.... And it is at that point that I think it is mandatory to do an arteriogram.

Dr. Garza–Vale did not testify that the standard of care was that Dr. Burke had an independent responsibility to order an arteriogram or serial arteriograms when Mr. Surber presented with symptoms of vertigo after the October 3 bleeding episode. Even assuming that his testimony

8. In their brief, appellees assert:
 [I]f [Mr. Surber] had presented to Burke with those symptoms *before* the second bleed, Burke would not have been required to perform an angiogram. But on October

15, 1998, when [Mr. Surber] presented to Burke for follow-up, *after* the second bleed, Burke was required to order an angiogram. Burke was negligent in not doing so.
(Emphasis original).

suffices, in the context of Dr. Burke's care, Dr. Garza–Vale later testified as follows: [9]

Q. . . . Now, I want to visit with you a little bit about Dr. Burke, if I can. When I first talked to you about Dr. Burke—and I think you conceded that today you don't have any criticism of that first [surgery] at all, do you?

A. No, sir.

Q. Nor any criticism of what he reported to Dr. Zane. That would be appropriate because that is what he thought he saw.

A. Yes.

Q. All right. Now, you know they had a conversation before he went into surgery. . . . . Now, he wasn't at the hospital at the time. . . . [Y]ou agreed with me that under those circumstances where if he wasn't at the hospital, he could rely upon the physicians at the hospital to make a decision about whether an arteriogram was necessary.

A. Yes, sir. . . . And I said given those circumstances, yes, I would agree with you.

Q. . . . And you believe . . . that the decision about whether or not there should have been an arteriogram should have been done at the time of that hospitalization?

A. Yes, sir. My opinion was that the arteriogram should have been done on that second hospitalization.

Q. Okay. And remember the first time I asked if [Dr. Burke] was not at the hospital, you weren't criticizing him for not doing an arteriogram, and you agreed.

A. Yes, sir. I believe that is the testimony.

Q. And you didn't have any other criticisms when I asked you all of the questions. Is that correct?

A. That is correct.

Q. Is that still your testimony today?

A. Yes, sir, presuming again, those facts were correct.

When asked if the standard of care required "all of the defendants to perform an angiogram . . . serially if necessary" after the October 3 bleed "anytime up until the time of his death," Dr. Garza–Vale testified that "it would have been the prudent thing to do." However, in the context of the breach of the proffered standard of care, Dr. Garza–Vale did not offer opinions critical of Dr. Burke. Moreover, Dr. Burke was not at the hospital during, and not otherwise involved, in the October 3 surgery, the point in time Dr. Garza–Vale testified it was mandatory to do an arteriogram. Dr. Garza–Vale did not testify that Dr. Burke breached the mandatory standard of care. He also did not testify that Dr. Burke breached any standard of care for serial arteriograms.[10]

9. Dr. Garza–Vale testified that he did not know that Dr. Burke was not at the hospital on October 3, or that Dr. Burke talked to Dr. Zane by telephone before Dr. Zane actually "went in to see the vessel" that day, or that Dr. Burke told Dr. Zane to call him if he needed him.

10. The question was directed to both an independent responsibility to order an arteriogram and serial arteriograms. Dr. Garza–Vale testified an arteriogram was mandatory on October 3 but he did not address serial arteriograms. Importantly, Dr. Garza–Vale had previously testified that serial arteriograms were required after the October 3 episode. He testified as follows:

> Q. The records that the jury will have in the case indicate that on October the 15th of '98, Tate returned to the offices of Dr. Brandt and Dr. Burke for follow-up visits. Assume with me that the records show that on those visits Tate had a dizzy—a complaint of dizziness, weakness, lightheadedness and had nausea and he described when he was in the shower he would get a feeling of dizziness or vertigo. Would that

Appellees also point to Dr. Gates's testimony. However, Dr. Gates testified he was "critical of the team that failed this patient" but did not have an opinion as to Dr. Burke and the October 3 episode. He did not testify that Dr. Burke had an independent responsibility to order an arteriogram. The evidence does not demonstrate that Dr. Burke was a member of the surgical team for the October 3 episode.[11] Dr. Gates testified he knew Dr. Garza–Vale and further testified as to the latter's opinion of Dr. Burke:

Q. And [Dr. Garza–Vale] would be familiar with what would be expected of a reasonably careful neurosurgeon under circumstances similar to this?

A. I believe so.

Q. And you would trust his judgment with regard to neurosurgical standards, wouldn't you?

A. Well, assuming things hadn't changed from when I knew him before.

As indicated above, Dr. Garza–Vale did not testify that Dr. Burke breached a standard of care. He did not criticize Dr. Burke. Dr. Gates testified he trusted Dr. Garza–Vale's judgment as to the neurosurgical standard of care. The record does not

demonstrate that Dr. Gates was specifically questioned as to whether Dr. Burke had an independent responsibility to order an arteriogram or serial arteriograms; rather, Dr. Gates testified that the team failed Mr. Surber. Dr. Gates also did not testify that Dr. Burke breached the standard of care.

Similarly, the record demonstrates that Dr. Mattox did not testify as to a standard of care or a breach of the standard of care. Outside the jury's presence, the trial court sustained the defense's objection on grounds Dr. Mattox is a surgeon and not qualified to testify as to the standard of care as to a neurosurgeon.

### C. Application

One element to prove a medical negligence claim is evidence of the applicable standard of care, which usually requires expert testimony. *Battaglia*, 177 S.W.3d at 899. The standard of care must first be established so that the fact finder can determine if the doctor's conduct deviated from the standard to the degree that it constituted malpractice. *Moreno v. M.V.*, 169 S.W.3d 416, 420–21 (Tex.App.-El Paso 2005, no pet.); *Bauer*, 700 S.W.2d at 651.

have been a good time for these physicians to order an angiogram?
A. Personally, I would have been worried if he gave me those kind of signs and symptoms that something was going on in his vascular system, perhaps instability of the artery or the artery spasming, opening, closing, pressures varying from moment to moment. Perhaps he is even embolizing. Sometimes what happens is you have a cap of clot on the outside of the artery; you may have some inside the artery, too. So some of those clots may shower up into the brain and cause some dizziness and light-headedness. As long as they dissolve, there's a process constantly in the body where you're forming clots and lysing them or breaking them down. That type of history would just worry me.

Q. Would standard of care require that an angiogram be done with those complaints?
A. Well, I don't know that it would necessarily in that circumstance; but, as I say, I think it would on the second bleed. Symptoms of that nature, per se, no; but the bleed, yes.
Q. So with nothing more than just the fact that on October 3 he bled, serial angiograms were required from that point on?
A. I do believe so.
However, in the context of Dr. Burke's independent responsibility to perform serial arteriograms after not participating in the October 3 surgery, Dr. Garza–Vale did not answer the question.

11. Dr. Garza–Vale testified that it was mandatory that an arteriogram be ordered after the October 3 episode.

It is not sufficient for a medical expert to simply state that he knows the standard of care and to then draw a conclusion as to whether that standard was met. *Moreno*, 169 S.W.3d at 420–21. Rather, the expert must explicitly state the standard of care and explain how the defendant's acts met or failed to meet that standard. *Id.; Bauer*, 700 S.W.2d at 651.

In this case, Dr. Garza–Vale was not critical of Dr. Burke. He unequivocally testified that the arteriogram was mandatory on October 3, when Dr. Burke was not present. Dr. Garza–Vale and Dr. Gates did not provide a standard of care for Dr. Burke's independent responsibility to order an arteriogram. Similarly, they did not provide a standard of care that Dr. Burke order serial arteriograms in the context of either the October 3 episode or any independent responsibility after that time. Appellees' experts' testimony does not satisfy the threshold question of what standard is used by which to measure the physician's acts or omissions. *See Rodriguez*, 730 S.W.2d at 21.

Even assuming that the evidence presented by appellees' experts, collectively or individually, established a standard of care applicable to an independent responsibility to order an arteriogram or serial arteriograms, the experts did not testify that Dr. Burke breached either one to the degree that it constituted malpractice. *Moreno*, 169 S.W.3d at 420–21. Because there is no evidence to show that the conduct of the physician violated or breached the standard of care, I would hold that the evidence is legally insufficient to prove standard of care and breach of a standard of care. *See Rodriguez*, 730 S.W.2d at 21. Accordingly, I would sustain Dr. Burke's first issue. Respectfully, because resolution of the issue would be dispositive, I do not address his remaining issues. *See* Tex. R.App. P. 47.1.

### III. Dr. Zane

By his seventh issue, Dr. Zane asks us to decide whether the trial court erred in overruling his properly preserved complaints as to opposing counsel's letter published in the local newspaper on the third day of trial.[12] Dr. Zane asserts that the letter improperly criticized physicians as dishonest and committing malpractice without consequence. He complains that the letter amounted to jury tampering and was prima facie prejudicial.

Dr. Zane assigns error to both the denials of the motion for mistrial on grounds of attorney misconduct and the motion for new trial on grounds of juror misconduct. He maintains that prejudice from the letter alone could be presumed and the testimony from one juror post-trial shows that prejudice indeed existed. Appellees respond that the trial court did not abuse its discretion in denying the motion for new trial. The majority decides that the bare presence of the letter is insufficient to establish prima facie harm. Respectfully, I disagree.

---

**12.** In addition to the text of the letter reproduced in note 4 of the majority opinion, the letter begins as follows:

**Bad doctors**

Re: "Malpractice Insurance Goes Under the Microscope" Feb. 10. As an attorney who handles medical malpractice cases, I think the situation described by the *Caller–Times* writer Naomi Snyder needs clarification.

First, let me say there are many fine physicians practicing in Corpus Christi. We as a community are lucky to have them. Having reviewed many cases, I can tell you there are certainly some physicians who consistently provide poor, substandard care.

## A. Relevant Facts

The jury trial involved both Dr. Burke and Dr. Zane. After the jurors were impaneled and sworn, the trial court admonished that jurors were "not to seek information contained in law books, dictionaries, public or private records, including the Internet these days, including any newspaper, television, radio broadcasts, which is not admitted in evidence." On the morning of the third day of trial when counsel's letter was published, Dr. Zane moved for a mistrial on grounds, in part, that the letter constituted an inappropriate ex parte communication with the jury to improperly influence them and posited, "We can hardly imagine that we could get a fair trial from this point forward as the result of this ... letter to the editor."

Opposing the motion for mistrial, appellees responded that Dr. Burke had appeared on the front page of the same newspaper a few weeks before trial "to affect what goes on in this courtroom." They added that the letter was in response to that article and argued, "[A]bsent Dr. Burke appearing on the front page of the paper, complaining of being sued too much and complaining of malpractice suits generally, this letter would never have been written." They further argued, "Once [Dr. Burke] has allowed the paper to run the picture and to run the article, we are damaged in a way that the Court cannot repair."

Some discussion ensued as to a media war on the question of medical malpractice in the community. The letter's author stated that he wrote it as a response "immediately upon reading Dr. Burke's article." The trial court stated that it was inappropriate for "either party to be doing their war in the newspaper." Subsequently, the trial court stated it might question the jury regarding whether they had read the letter. Appellees argued that it "would just bring it to their attention .... they will just go pick up the paper tonight, if they haven't read it already." Appellees stated that prejudice, if any, was to appellees. Appellees argued, "[T]his jury is smart enough to—hopefully, will weigh the things they read in the paper and what they hear on the radio and television and judge this case on the merits."

The trial court recalled it had admonished the jury not to read newspaper articles. The trial court admonished the parties to "not do further harm, potential harm" and denied Dr. Zane's motion for mistrial.

The parties do not dispute that the article featuring Dr. Burke appeared two and a half weeks before trial. The record does not demonstrate that Dr. Zane was involved in, with, or through the media, either offensively or defensively.

## B. The Law

A trial court's denial of a motion for mistrial is reviewed under an abuse of discretion standard. *Till v. Thomas*, 10 S.W.3d 730, 734 (Tex.App.-Houston [1st Dist.] 1999, no pet.). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles or, in other words, whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). The mere fact that a trial court may decide a matter within its discretionary authority in a different way than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.* at 242.

Every claim of jury prejudice because of media attention appearing during a trial must turn on its own facts. *See Ladner v. State*, 868 S.W.2d 417, 423 (Tex.App.-Tyler

1993, pet. ref'd) (citing *Marshall v. United States*, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959)). An overt act may be the most compelling factor to show prejudice. *Texas Employers' Ins. Ass'n v. McCaslin*, 159 Tex. 273, 275, 317 S.W.2d 916 (1958). There is no requirement that the party asserting error must show injury beyond a reasonable probability in order to secure a reversal of a judgment. *McCaslin*, 159 Tex. at 275, 317 S.W.2d 916. There are some types of misconduct that are so highly prejudicial and inimical to a fair trial that probable injury can be assumed, and the burden of proving probable injury is met, prima facie at least, by simply showing the improper act and nothing more. *See Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 448 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (finding no harm in improper communication with juror because the juror voted in appellant's favor).

### C. Application

The letter stated, "The repercussions for the patients are far more severe and often result in death." Thus, it touched on the health care claim against Dr. Zane. The letter also stated, "The malpractice problem is further exacerbated when fellow physicians fail to come forward and honestly testify in malpractice cases against malpracticing doctors, even when the malpractice is obvious." Thus, it also touched on the credibility of the doctors testifying in defense of the claim, including Dr. Zane both as a defendant and a "fellow physician" of Dr. Burke. The sole defense in support of the letter was that it was in response to the article featuring Dr. Burke. Appellees conceded that they were "damaged in a way that the Court cannot repair" by the article featuring Dr. Burke that appeared over two weeks before trial. I conclude that the letter published in the midst of trial was no less harmful to Dr. Zane.

The record does not demonstrate that Dr. Zane was directly involved with the pre-trial article featuring Dr. Burke. The letter touched on the claims against which Dr. Zane must defend. By admonishing that the parties not do "further harm," the trial court implicitly found the published letter demonstrated prima facie harm. I would hold that the trial court's implicit finding is supported by this record. *Ladner*, 868 S.W.2d at 423; *McCaslin*, 159 Tex. at 275, 317 S.W.2d 916. Accordingly, I would also hold that the trial court abused its discretion by denying Dr. Zane's motion for a mistrial. *Downer*, 701 S.W.2d at 241–42. I would sustain Dr. Zane's seventh issue presented.

### IV. Conclusion

Absent proof of a standard of care or breach of that standard, I would sustain Dr. Burke's first issue presented. Finding the record demonstrates that opposing counsel's letter demonstrates prima facie harm, I would sustain Dr. Zane's seventh issue presented. Thus, I respectfully dissent.