NUMBER 13-05-743-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


INNOVATIVE TRUCK STORAGE, INC., Appellant,


v.
 


AIRSHIELD CORPORATION, Appellee.

 


On appeal from the 103rd District Court 


of Cameron County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Yañez and Vela


Memorandum Opinion by Justice Vela



 Innovative Truck Storage, Inc., ("ITS") appeals from a judgment in its favor for
negligent misrepresentation against Airshield Corporation. By four issues, ITS
complains of jury misconduct, challenges the legal and factual sufficiency of the
evidence to support the award of damages, and complains the trial court failed to
award pre- and post-judgment interest. Airshield raises two cross-points. We modify
the judgment, and as modified, we affirm. 

Background


 ITS, the developer of the "Hide-N-Side," an aftermarket storage system for pick-up trucks, entered into a manufacturing relationship with Airshield in which Airshield
agreed to make the Hide-N-Side for ITS. Thereafter, ITS sued Airshield for negligence
and negligent misrepresentation, claiming Airshield negligently produced the Hide-N-Side, causing the eventual loss of ITS's entire customer base. The jury found ITS
sixty-percent negligent and Airshield forty-percent negligent. The jury awarded ITS
$133,000 in damages for negligent misrepresentation and zero damages on its
negligence claim.

I.


Motion for New Trial


 By issue one, ITS argues the trial court erred by failing to grant a new trial based
upon jury misconduct. A trial court has discretion to either grant or deny a new trial,
and we will not disturb its decision absent an abuse of that discretion. Brandt v.
Surber, 194 S.W.3d 108, 133 (Tex. App.-Corpus Christi 2006, pet. filed) (citing
Brown v. Hopkins, 921 S.W.2d 306, 311 (Tex. App.-Corpus Christi 1996, no writ)). 
A trial court abuses its discretion when the record clearly shows its decision was
arbitrary and unreasonable. Id. (citing Simon v. York Crane & Rigging Co., 739
S.W.2d 793, 795 (Tex. 1987)). To warrant a new trial for jury misconduct, the
movant must show: (1) the misconduct occurred; (2) it was material; and (3) probably
caused injury. Tex. R. Civ. P. 327(a); Golden Eagle Archery, Inc. v. Jackson, 24
S.W.3d 362, 372 (Tex. 2000); Brandt, 194 S.W.3d at 133. Whether jury misconduct
occurred and caused injury is a question of fact for the trial court. Golden Eagle, 24
S.W.3d at 372 (citing Pharo v. Chambers County, 922 S.W.2d 945, 948 (Tex.
1996)); Brandt, 194 S.W.3d at 133. 

 ITS points out in its appellate brief that during voir-dire examination, counsel for
ITS asked the venire members several times whether the fact that Scott Clare and Neil
Long (the founders of ITS) "'are millionaires, already have lots of money . . . and are
successful businessmen' would influence their decision-making process, or would
cause the members of the panel to view ITS 'in a negative way and make [them] not
be fair to [ITS].'" In response, none of the venire members raised their hands. In its
motion for new trial, ITS relied upon the affidavits of four jurors as evidence of alleged
jury misconduct.

 Juror Minton stated that during numerous trial breaks during the trial, she heard
several jurors say that because Long and Clare "already had enough money," they
would ignore the evidence, not hold Airshield liable or completely negligent, and not
award damages to ITS. Juror Garcia stated that during a trial break on the second or
third day of trial, she heard two jurors indicate that because ITS "already had enough
money," they would disregard the evidence, not hold Airshield liable or completely
negligent, and would not award damages to ITS. Juror Rojas stated that throughout
the trial and before jury deliberations began, she and her fellow jurors discussed the
fact that Long and Clare were apparently wealthy and did not need an award of
additional money or damages. Finally, juror Clancy stated that prior to deliberations,
a fellow juror asked him whether he was leaning in favor of ITS or Airshield. He
reminded the juror that they were not to discuss the case until all the evidence had
been heard.

 After hearing argument, the trial court refused to grant a new trial. ITS argues
the four affidavits showed jury misconduct consisting of undisclosed bias and prejudice
which caused a "false verdict." Failure to disclose bias is a form of juror misconduct
that justifies a new trial under the appropriate circumstances. Golden Eagle, 24
S.W.3d at 371.

A.


The Holding in Golden Eagle


 In Golden Eagle, plaintiff filed a motion for new trial alleging that juror Maxwell
concealed a bias during voir dire and that she and other jurors committed jury
misconduct before and during formal deliberations. Id. at 364. The motion included
juror Frederick's affidavit who testified in his affidavit and at the new-trial hearing that
during a trial recess, he had a conversation with Maxwell, at which time she made
comments he thought contradicted her statements during voir-dire. Id. at 364-65. 
The trial court overruled the motion for new trial. Id. at 366. The supreme court
affirmed the trial court's decision and stated:

 [T]he trial court may not have considered Frederick's testimony to
have been credible. It was certainly hearsay, and while no objection was
made to its admission to preclude the trial court from considering it, the
trial court was nevertheless free on its own to disregard the testimony.


 We conclude that the evidence about discussions prior to formal
deliberations does not establish jury misconduct here, and Rules 606(b)
and 327(b) prohibit considering the testimony about matters and
statements occurring in the course of the jury's formal deliberations. . .
. 


Id. at 373-74.

B.


Analysis



 Hearsay is a statement, other than one made by a declarant while testifying at
the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex.
R. Evid. 801(d). ITS, in order to demonstrate jury misconduct, relied upon four juror
affidavits containing remarks made by other jurors during trial breaks. Thus, the
affidavits constituted hearsay. See Tex. R. Evid. 801(d); Golden Eagle, 24 S.W.3d at
373. Airshield's counsel lodged a hearsay objection to the four affidavits. 
Accordingly, the trial court was free to disregard the affidavits as hearsay. See Golden
Eagle, 24 S.W.3d at 373. Therefore, because the record does not show the trial
court's decision to deny a new trial was arbitrary and unreasonable, we hold that the
trial court did not abuse its discretion by denying the motion for new trial. See Golden
Eagle, 24 S.W.3d at 373-74.

C.


Evidentiary Hearing


 In its reply brief, ITS presented argument and authority contending that the trial
court reversibly erred by not holding an evidentiary hearing on its motion for new trial. 
See Tex. R. Civ. P. 327(a). (1) ITS made this same argument in a subsequent letter brief. 
Our appellate rules set forth the required contents and organization of an appellant's
brief. Bankhead v. Maddox, 135 S.W.3d 162, 163 (Tex. App.-Tyler 2004, no pet.);
see Tex. R. App. P. 38.1. "The [appellant's] brief must state concisely all issues or
points presented for review." Tex. R. App. P. 38.1(e). Rule 38.3 states that "The
appellant may file a reply brief addressing any matter in the appellee's brief." Tex. R.
App. P. 38.3. However, an appellant may not use a reply brief to raise new issues. 
Lopez v. Montemayor, 131 S.W.3d 54, 61 (Tex. App.-San Antonio 2003, pet.
denied); see Anderson Producing, Inc. v. Koch Oil Co., 929 S.W.2d 416, 424 (Tex.
1996) (court declined to consider issue first raised in reply brief). Therefore, because
ITS failed to raise this issue in its appellant's brief, we hold that ITS has waived this
complaint for appellate review. Issue one is overruled.

II.


Airshield's Cross-Points


 Before resolving ITS's remaining issues, we must address Airshield's cross-points. By its first cross-point, Airshield argues that we should reverse and render the
negligent misrepresentation finding because this is solely a breach of contract case and
not a case in tort. Although a party's actions may breach duties in tort, contract, or
both, our supreme court has recognized that "mere nonfeasance under a contract
creates liability only for breach of contract." Crawford v. Ace Sign, Inc., 917 S.W.2d
12, 13 (Tex. 1996); Jim Walter Homes, Inc. v. Reed, 711 S.W.2d 617, 618 (Tex.
1986). "When the injury is only the economic loss to the subject of a contract itself,
the action sounds in contract alone." Reed, 711 S.W.2d at 618. In Southwestern Bell
Tel. Co. v. DeLanney, 809 S.W.2d 493 (Tex. 1991), the court held that

 If the defendant's conduct . . . would give rise to liability independent of
the fact that a contract exists between the parties, the plaintiff's claim
may also sound in tort. Conversely, if the defendant's conduct . . .
would give rise to liability only because it breaches the parties'
agreement, the plaintiff's claim ordinarily sounds only in contract.


Id. at 494 (cited with approval in DeWitt County Elec. Co-op. v. Parks, 1 S.W.3d 96,
105 (Tex. 1999)) (footnote omitted).

 To recover on a claim for negligent misrepresentation, there must be an injury
independent of damages for the breach of contract claim. See D.S.A., Inc. v. Hillsboro
Indep. Sch. Dist., 973 S.W.2d 662, 663-64 (Tex. 1998) (per curiam); Blue Star
Operating Co. v. Tetra Technologies, Inc., 119 S.W.3d 916, 922 (Tex. App.Dallas
2003, pet. denied). In the instant case, Airshield has provided neither record citations
nor authority to support the existence of a contract. We note that in its original
petition, ITS alleged causes of action for breach of an oral contract and negligent
misrepresentation, but abandoned the contract claim in its amended petition. (2) ITS
does not allege the existence of a contract, nor does it allege that it relied on
Airshield's misrepresentations in entering into a contract. Therefore, ITS has no
obligation to show an injury independent of a hypothetical contract claim because it
tried this case on two theories of recovery-negligence and negligent
misrepresentation. The first cross-point is overruled.

 By its second cross-point, Airshield argues the jury's finding that ITS was sixty-percent negligent requires us to render a take-nothing judgment. The law of
proportionate responsibility provides that a claimant may not recover damages if its
percentage of responsibility is greater than fifty percent. Tex. Civ. Prac. & Rem. Code
Ann. § 33.001 (Vernon 1997). However, ITS alleged two separate causes of action: 
negligence and negligent misrepresentation. The first question in the charge asked the
jury, "Did the negligence, if any, of those named below proximately cause the
occurrence in question?" The jury answered "YES" to both parties. The jury found
ITS sixty-percent negligent in response to the next question and awarded no damages
for the negligence claim. In response to Question No. 4, the jury found that Airshield
made a negligent misrepresentation on which ITS justifiably relied. There was no
comparative-fault question relating to the negligent misrepresentation claim. We point
out that neither party requested a comparative-fault issue relating to the liability
question for negligent misrepresentation. Further, neither party objected to the trial
court's failure to include a comparative-fault issue relating to the liability question for
negligent misrepresentation. Therefore, the issue is not preserved for appellate review. 
Tex. R. App. P. 33.1(a)(1)(A); Tex. R. Civ. P. 279.

III.


Negligent Misrepresentation Damages



 By issues two and three, ITS complains the jury's award of $133,000 as
damages for negligent misrepresentation was based on factually and legally insufficient
evidence.

A.


Standard of Review



 The jury has discretion to award damages within the range of evidence
presented at trial. Gulf States Utilities Co. v. Low, 79 S.W.3d 561, 566 (Tex. 2002). 
The jury is the sole judge of the credibility of witnesses and the weight to be given to
their testimony. Golden Eagle Archery, Inc., v. Jackson, 116 S.W.3d 757, 761 (Tex.
2003). In conducting a factual sufficiency review, a court must not merely substitute
its judgment for that of the jury. Id.

 When a party attacks the factual sufficiency of the evidence on an adverse
finding on an issue on which it has the burden of proof, that party must demonstrate
on appeal that the adverse finding is against the great weight and preponderance of
the evidence. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001) (per
curiam). We must consider and weigh all of the evidence, and we can set aside the
verdict only if the evidence is so weak or if the finding is so against the great weight
and preponderance of the evidence that it is clearly wrong and unjust. Id.

 In Golden Eagle, the supreme court stated that in order for it to conduct a
meaningful review of whether an appellate court has correctly applied the factual
sufficiency standard, appellate courts "'should, in their opinions, detail the evidence
relevant to the issue in consideration and clearly state why the jury's finding is
factually insufficient or is so against the great weight and preponderance as to be
manifestly unjust; why it shocks the conscience; or clearly demonstrates bias.'" 
Golden Eagle, 116 S.W.2d at 761 (quoting Pool v. Ford Motor Co., 715 S.W.2d 629,
635 (Tex. 1986), overruled on other grounds by Crown Life Ins. Co. v. Casteel, 22
S.W.3d 378 (Tex. 2000)). The Golden Eagle court further stated "'those courts, in
their opinions, should state in what regard the contrary evidence greatly outweighs the
evidence in support of the verdict. It is only in this way that we will be able to
determine if the requirements of In re King's Estate have been satisfied.'" Id. (quoting
Pool, 715 S.W.2d at 635). In In re King's Estate, the supreme court held that a court
of appeals must

 consider and weigh all of the evidence in the case and to set aside the
verdict and remand the cause for a new trial, if it thus concludes that the
verdict is so against the great weight and preponderance of the evidence
as to be manifestly unjustthis, regardless of whether the record contains
some "evidence of probative force" in support of the verdict. . . . The
evidence supporting the verdict is to be weighed along with the other
evidence in the case, including that which is contrary to the verdict.


Golden Eagle, 116 S.W.3d at 761-62 (quoting In re King's Estate, 244 S.W.2d 660,
661 (1951) (per curiam) (footnote omitted)).

 When a party attacks the legal sufficiency of an adverse finding on an issue on
which it has the burden of proof, it must demonstrate on appeal that the evidence
established, as a matter of law, all vital facts in support of the issue. Francis, 46
S.W.3d at 241 (citing Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex.
1989)). In reviewing a "matter of law" challenge, we must first examine the record
for evidence that supports the finding, while ignoring all evidence to the contrary. Id.
(citing Sterner, 767 S.W.2d at 690). If there is no evidence to support the finding, the
reviewing court will then examine the entire record to determine if the contrary
proposition is established as a matter of law. Id. (citing Sterner, 767 S.W.2d at 690). 
The point of error should be sustained only if the contrary proposition is conclusively
established. Id. (citing Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983)). In
this context, a proposition has been established as a matter of law when a reasonable
finder of fact could draw only one conclusion from the evidence presented. See
generally City of Keller v. Wilson, 168 S.W.3d 802, 814-16 (Tex. 2005).

B.


Jury Question



 Before conducting a factual sufficiency review, a court must first have a clear
understanding of the evidence pertinent to the inquiry. Golden Eagle, 116 S.W.3d at
762. Generally, the starting point is the charge and instructions to the jury. Id. Here,
the jury was instructed and answered as follows:

 What sum of money, if any, if paid now in cash would fairly and
reasonably compensate ITS for its damages, if any, that were proximately
cause[d] by such negligent misrepresentation?


 Consider the following element of damages, if any, and none other.


 The economic loss, if any, otherwise suffered as a consequence
of ITS' reliance on the misrepresentation. Economic damages for
negligent misrepresentation are limited to those necessary to compensate
the party for the financial loss caused by the misrepresentation. Do not
include lost profits past or future in this answer.


 Do not add any amount of interest on past damages, if any.


 Answer in dollars and cents for damages, if any.


 ANSWER: $133,000.00


C.


The Evidence



 ITS contends "the evidence at trial was unequivocal, undisputed, and
unchallenged" that it suffered a minimum of $2,662,354 in out-of-pocket, or
pecuniary, losses. (3) To establish this figure, ITS relied upon the testimony of its CEO,
Neil Long. Long's testimony showed ITS created financial statements for the years
1996 to 2001. He identified Plaintiffs' Exhibit 346 as a summary of ITS's financial
statements. ITS's counsel questioned him about the summary as follows:

 Q. Very briefly, on the bottom right hand corner is listed the number
$2,162,354, does that number represent your out of pocket loses [sic]
which is the amount of money you put into this business through your
dealings with Airshield?


 A. This is the net out of pocket costs.


 Q. [D]oes that include money that you spent on other assets that
depreciate over time?


 A. [T]hose would not normally be shown on those compilations.


 Q. Why wouldn't you have other assets that you spent money on be
listed in this number?


 A. Well, normally depreciable assets or assets you are amortizing or
inventorying would not be shown on those.


 Q. What is the asset that you spent money on that is not listed within
this number, which is your expenses, your out of the pocket losses? 


 A. I don't remember the exact amount, but it's probably $500,000 to
$600,000, maybe $650,000, more than that.


 Q. Now, this is different than lost profits, this is only what you have put
out?


 A. That's cash out of pocket.


 Q. We are not talking about lost profits here, correct?


 A. No, we are not.


 Q. That $500,000 in inventory, what is that inventory, very briefly?


 A. The inventory is just Hide'N Side metal parts created by Litec, and
brochures, a number of other things related to that, and we also have
some tool and die stuff.


 Q. I know you spent $500,000, give or take on that, on those materials
at some point. Without the benefit of adequate Airshield parts, what is
the value of that inventory? 

 

 A. Well, currently without the parts, they have little or no value,
probably scrap value for the metal parts currently.


 Q. So this number, $2,162,354.76, plus roughly $500,000 of
inventory, these are your out of pocket loses [sic] or expenses?


 A. Yes.


ITS submitted into evidence its income statements and financial documents showing
the out-of-pocket expenses.

 ITS asserts that "Out-of-pocket damages were further discussed by Otto
Meyers, ITS's expert." ITS directs our attention to Meyers' testimony in volume 11,
page 259 of the reporter's record. On direct-examination, Meyers, a CPA, testified as
follows:

 Q. Let's go back briefly to the damages line. . . . [T]he second item on
this is out of pocket loses [sic], can you briefly describe what those are
and how you went about calculating them? 


 A. Very simple, that comes directly from their [ITS's] actual financial
statements and that is the loss that they actually incurred when they
should have been earning the profits that they have lost.


 Q. And you did that only for a discreet [sic] time frame, from May of
1999 through April of 2001?


 A. That's correct.


 Q. Are the actual out of pocket loses [sic] greater than that?


 A. Sure.


 Airshield contends the jury's damages award of $133,000 was based on
factually and legally sufficient evidence. It argues that ITS initially invested $132,617
for the initial tooling and mold production for the Hide-N-Side project. To support this
assertion, Airshield directs our attention to its "BID FORM" for the Hide-N-Side
(Plaintiff's Exhibit 8) and to its letter to Neil Long regarding the Hide-N-Side project
(Plaintiff's Exhibit 10). These exhibits showed Airshield's tooling cost to be
$132,617.

 Airshield also contends ITS believed Airshield's first production run of Hide-N-Side parts was defective; however, instead of "cutting its losses" by having a different
manufacturer make the Hide-N-Side parts, ITS "continued for over two years of self
induced design revisions, production changes, and other negligent actions that resulted
in the product's failure and the end of the business relationship." The evidence
showed that in January 1997, Airshield submitted to ITS preliminary price quotations
for manufacture of the Hide-N-Side parts. In April 1997, Airshield amended its
preliminary price quotations, and production began in July 1999. Airshield's president,
Doug Christie, testified that after production began, numerous problems were
discovered with the Hide-N-Side. According to him, some of these problems such as
resin-rich shrinkage, waviness in the paint job, and separation of the door panels, 
were attributable to Airshield. He said that other problems concerned the Hide-N-Side
design and were attributable to ITS. Christie testified that the Hide-N-Side "customer
is expecting something that we weren't set up to create, that we weren't going to be
able to give them." When Airshield's counsel asked him, "And you clearly
communicated that to . . . [ITS] along the way?", he replied, "We talked about it a
lot." As a result of some of the issues that kept cropping up, Airshield, in early 2000,
stopped production of the Hide-N-Side. About October 2000, its relationship with ITS
ended.

 Testimony by Scott Clare, ITS's president, showed Airshield's first production
run produced useless and unacceptable Hide-N-Side parts. When Airshield's counsel
asked him whether the second run produced "parts equally unacceptable and useless,"
he replied, "They were returned, I believe." Despite the existence of about twenty
fiberglass manufacturers in the Brownsville area (Airshield is located in Brownsville,
Texas), ITS did not contact any of these companies to see if they could do a better job
making the Hide-N-Side. Instead, ITS stayed with Airshield. ITS made changes to the
Hide-N-Side, but Airshield could not produce the Hide-N-Side to ITS's satisfaction.

 Airshield's expert, Wayne Wells, who had a doctorate degree in manufacturing
and industrial engineering, testified that the Hide-N-Side was not designed for mass
production because it contained features that would be extremely difficult to produce
in large quantities. He stated that "the problem is a combination, it's [sic] all
composites projects are, it's a combination of developing the process and developing
the design simultaneously . . . . Composites are very difficult to work with and you
have to address the specific properties and problems of the materials and the process
that you use to produce it." His testimony showed that the Hide-N-Side design,
combined with the use of the composites, made the Hide-N-Side hard to manufacture.

D.


Analysis


 We do not believe the evidence was "unequivocal, undisputed, and
unchallenged" that ITS suffered a minimum of $2,662,354 in out-of-pocket, or
pecuniary, losses. The evidence showed the $2,662,354 figure had two components: 
(1) $2,162,354 derived from ITS's financial statements for 1996-2001; and (2) a
$500,000 asset expense. Regarding the first component, the evidence showed
Airshield did not submit preliminary price quotes to ITS for production of Hide-N-Side
parts until January 1997 and that production began in July 1999. Airshield stopped
production in early 2000, and its relationship with ITS ended about October 2000. 
Moreover, when ITS's counsel asked Neil Long if the $2,162,354 amount
"represent[ed] your out of pocket loses [sic] which is the amount of money you put
into this business through your dealings with Airshield," he replied, "This is the net out
of pocket costs." His reply did not affirmatively attribute the out-of-pocket costs to
Airshield. Thus, the evidence is not unchallenged that Airshield was responsible for
the $2,162,354 in out-of-pocket losses for 1996-2001.

 Regarding the second component, when ITS's counsel asked Long, "What is the
asset that you spent money on that is not listed within this number, which is your
expenses, your out of the pocket losses?", he could not remember the exact amount
and stated it was "probably" "$500,000 to $600,000, maybe $650,000, more than
that." Thus, the evidence in support of the second component to the $2,662,354
figure is not unequivocal and is somewhat speculative.

 Furthermore, the evidence showed that the two production runs produced
substandard parts for the Hide-N-Side. Some production problems were attributable
to Airshield, and other problems were attributable to ITS. ITS took steps to correct
these problems. At some point, Airshield realized it could not create the quality of
product ITS's customers expected and related this concern to ITS. Despite the
existence of about twenty fiberglass manufacturers in the Brownsville area, ITS did not
contact any of these companies to see if they could make the Hide-N-Side. Thus, the
evidence is not undisputed that Airshield is responsible for $2,662,354 in out-of-pocket expenses because ITS did not mitigate these damages and according to
Airshield's expert, designed a product which could not be mass produced.

 After considering and weighing all of the evidence, we conclude the evidence
supporting the amount of damages awarded is not so weak nor is the finding so
against the great weight and preponderance of the evidence as to be manifestly unjust. 
We overrule issues two and three.

IV.


Interest



 By issue four, ITS complains the trial court erred in failing to award pre- and
post-judgment interest. Although ITS requested pre- and post-judgment interest in its
pleadings, the final judgment did not include an award for either pre- or post-judgment
interest.

A.


Post-judgment Interest



 Section 304.001 of the Texas Finance Code states: "A money judgment of a
court in this state must specify the post-judgment interest rate applicable to that
judgment." Tex. Fin. Code Ann. § 304.001 (Vernon 2006). Thus, post-judgment
interest is mandated by statute, and is recoverable even if the trial court's judgment
does not mention it. See Jarrin v. Sam White Oldsmobile Co., 929 S.W.2d 21, 25
(Tex. App.Houston [1st Dist.] 1996, writ denied) (discussing Tex. Rev. Civ. Stat. art.
5069-1.05, the predecessor statute to section 304.001); Staff Indus., Inc. v. Hallmark
Contracting, Inc., 846 S.W.2d 542, 551 (Tex. App.-Corpus Christi 1993, no writ);
see also Tex. Fin. Code Ann. § 304.003 (Vernon 2006) (providing post-judgment
interest rates), § 304.005(a) (stating general rule for accrual of post-judgment interest
on money judgment).

B.


Prejudgment Interest



 The award of prejudgment interest is generally discretionary with the trial court. 
Mid-Century Ins. Co. v. Kidd, 974 S.W.2d 848, 850 (Tex. App.-El Paso 1998), rev'd
on other grounds, 997 S.W.2d 265 (Tex. 1999); Lege v. Jones, 919 S.W.2d 870,
875-76 (Tex. App.-Houston [14th Dist.] 1996, no writ); Southwest Airlines Co. v.
Jaeger, 867 S.W.2d 824, 837 (Tex. App.-El Paso 1993, writ denied). The two legal
sources for an award of prejudgment interest are (1) general principles of equity and
(2) an enabling statute. Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962
S.W.2d 507, 528 (Tex. 1998); Manufacturers Auto Leasing, Inc. v. Autoplex Leasing,
Inc., 139 S.W.3d 342, 348 (Tex. App.-Fort Worth 2004, pet. denied). The enabling
statute, section 304.104 of the Texas Finance Code, applies to personal injury,
wrongful death, and property damage claims. See Tex. Fin. Code Ann. §§ 304.101,
304.104 (Vernon 2006). Here, ITS sought out-of-pocket expenses as a result of
Airshield's negligent misrepresentation. However, this type of claim does not fall
within the scope of "property damage" cases expressed in section 304.101 of the
finance code. Section 304.101 only includes claims for damage to property, not
economic loss. See Johnson & Higgins of Tex., 962 S.W.2d at 530.

 In Cavnar the supreme court allowed prejudgment interest in tort actions on
equitable grounds. Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549, 552
(Tex. 1985), superseded by statute as stated in C & H Nationwide, Inc. v. Thompson,
903 S.W.2d 315, 324-28 (Tex. 1994) and overruled in part on other grounds by
Johnson & Higgins of Tex., 962 S.W.2d at 528-37. The Legislature's codification and
modification of Cavnar did not purport to provide a statutory framework for
prejudgment interest in all cases. Johnson & Higgins of Tex., 962 S.W.2d at 530. 
The purpose of prejudgment interest is to encourage settlement and to remove
incentives for delay. Id. at 529. In this case, the trial court's judgment does not
indicate why prejudgment interest was not included. We note that ITS filed suit on
November 22, 2000, but that the trial did not start until April 2005. The record does
not reveal why the trial was delayed, but the trial court could have concluded that the
circumstances surrounding this delay made a prejudgment interest award unequitable. 
Consequently, we cannot say that the trial court abused its discretion by denying an
award of prejudgment interest. We sustain that part of issue four requesting post-judgment interest. We overrule that part of issue four requesting prejudgment interest.

 We modify the trial court's judgment to reflect an award of post-judgment
interest at the legal rate. As modified, the judgment is affirmed.

 

 

 ROSE VELA

 Justice


Memorandum Opinion delivered and 

filed this 21st day of June, 2007.
1. This rule provides, in relevant part, that "When the ground of a motion for new trial, supported
by affidavit, is misconduct of the jury . . . the court shall hear evidence thereof from the jury or others
in open court . . . ." Tex. R. Civ. P. 327(a).
2. See "PLAINTIFF INNOVATIVE TRUCK STORAGE, INC.'S FIFTH AMENDED PETITION."
3. In Federal Land Bank Ass'n v. Sloane, 825 S.W.2d 439 (Tex. 1991), the court set forth the
damages recoverable under a negligent misrepresentation claim:

 

 (1) The damages recoverable for a negligent misrepresentation are those necessary to
compensate the plaintiff for the pecuniary loss to him of which the misrepresentation
is the legal cause, including

(a) the difference between the value of what he has received in the transaction and its
purchase price or other value given for it; and

(b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon
the misrepresentation.

(2) the damages recoverable for a negligent misrepresentation do not include the benefit
of the plaintiff's contract with the defendant.


Sloane, 825 S.W.2d at 442 (quoting Restatement (Second) of Torts § 552B (1977)).